PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　　*Plaintiff-Appellee,*

v.

OBIE LEE POWELL,

　　　　　*Defendant-Appellant.*

No. 08-4696

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, Senior District Judge.
(8:07-cr-00162-PJM-1)

Argued: September 23, 2011

Decided: November 14, 2011

Before KING, SHEDD, and FLOYD, Circuit Judges.

Vacated by published opinion. Judge Shedd wrote the majority opinion, in which Judge Floyd joined. Judge King wrote a dissenting opinion.

## COUNSEL

**ARGUED:** Daniel W. Stiller, FEDERAL DEFENDER SERVICES OF WISCONSIN, INCORPORATED, Milwaukee, Wisconsin, for Appellant. Jonathan C. Su, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for

Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

---

# OPINION

SHEDD, Circuit Judge:

During a routine traffic stop in Seat Pleasant, Maryland, police removed Obie Lee Powell, who was a passenger, from the vehicle and performed an officer-safety patdown on him. Based on evidence obtained by police after the patdown, a federal grand jury indicted Powell for possession with intent to distribute crack cocaine, possession of a firearm by a convicted felon, and possession of a firearm in furtherance of a drug trafficking crime. Before trial, Powell moved to suppress this evidence, arguing that the officers obtained it in violation of the Fourth Amendment. Following an evidentiary hearing, the district court denied the motion, holding (*inter alia*) that the officers had reasonable suspicion that Powell was armed and dangerous and were thus entitled to frisk him. Thereafter, a jury convicted Powell of the lesser-included offense of simple possession of crack cocaine and acquitted him of the other charges, and the court sentenced him to a 63-month term of imprisonment. On appeal, Powell contends that the court erred by denying his suppression motion.

In a case such as this, where law enforcement officers briefly patdown a person for safety reasons, reasonable suspicion that the person is armed and dangerous is necessary in order for the patdown to be lawful under the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1 (1968). Earlier this year, in *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011), we noted "our concern about the inclination of the Government toward using whatever facts are present, no matter how innocent, as indicia of suspicious activity." Twice in the past few months, we reiterated this concern. *See United States v.*

*Massenburg*, 654 F.3d 480, 482 (4th Cir. 2011); *United States v. Digiovanni*, 650 F.3d 498, 512 (4th Cir. 2011). In all three cases, we held that the Government failed to meet its minimal burden of articulating facts sufficient to support a finding of reasonable suspicion. Today, we once again are presented with a case in which the Government has attempted to meet its burden under *Terry* by cobbling together a set of facts that falls far short of establishing reasonable suspicion. For this reason, we vacate the judgment.

I

We construe the evidence in the light most favorable to the Government, the prevailing party below. *United States v. Kelly*, 592 F.3d 586, 589 (4th Cir.), *cert. denied*, 130 S.Ct. 3374 (2010). During the evidentiary hearing, the Government presented the testimony of three witnesses who were employed by the Seat Pleasant Police Department and were present at the traffic stop: Officer Catrina Davis, Officer Christopher Shelby, and Corporal Leroy Patterson.[1] With the exceptions noted below, the parties agree that the testimony establishes the following facts, which are consistent with the district court's findings.

On the night of November 21, 2006, while on routine patrol, Officer Davis observed a 1997 Buick occupied by three individuals pull out from a parking lot. Powell was a passenger in the backseat of the Buick. Because the Buick had a burned-out headlight, Officer Davis stopped it. The stop occurred without incident.

Officer Davis made contact with the driver, Jermaine

---

[1]On the night in question, Officer Davis had been employed by the Seat Pleasant Police Department for approximately one year, and she was being field-trained by Corporal Patterson, who had been employed by the Department for four years. The record is silent concerning Officer Shelby's law enforcement experience.

Mitchell, and obtained his driver's license and vehicle registration. At the same time, Corporal Patterson, who was on patrol with Officer Davis, approached the passenger side. As Officer Davis returned to her patrol car to process Mitchell's traffic citation, Corporal Patterson engaged in an amicable conversation with Powell. The topics of this conversation included their mutual appreciation of fish sandwiches (which Powell was eating) and music (which was audible in the Buick). During this conversation, Officer Shelby arrived to provide back-up assistance and joined Corporal Patterson at the passenger side of the Buick. A fourth officer was on the scene, but that officer does not appear to have played a material part in the traffic stop.

At some point, Powell indicated that he needed to pick up a child, and he asked how long the traffic stop would last. Corporal Patterson responded that he could not be certain about the expected duration of the traffic stop, and he told Powell that he was free to leave if he so desired. Powell declined the offer and remained in the Buick.

Eventually, an incoming radio communication advised Officer Davis, who was in her patrol car, that Mitchell's license was suspended. Officer Shelby, who was still standing by the Buick passenger side, heard this communication on his personal radio, and he asked Powell and the other passenger (identified as "Tawanda") if either one of them had a valid driver's license.[2] Although Officer Shelby's reason for asking

---

[2]Presumably based on Officer Davis' testimony, the district court found that Officer Shelby asked for a "valid" driver's license. J.A. 87. Powell contends that this finding is clearly erroneous because Officer Shelby and Corporal Patterson testified that Officer Shelby only asked for a driver's license (not a "valid" license), and Officer Davis was in the patrol car when the question was asked. To the extent that this contention is properly before us, Powell is correct about the witnesses' respective testimony and vantage points, but those factors do not render the court's finding clearly erroneous. Notwithstanding her vantage point, Officer Davis testified that she heard Officer Shelby ask for the license, *see* J.A. 28, and her testimony is sufficient to support the finding.

was to ascertain if either passenger could drive the vehicle away after the completion of the traffic stop, which they would have been permitted to do, he did not communicate that reason to Powell or Tawanda.

Powell gave his license to Officer Shelby who, in turn, checked its status via radio. A responsive radio communication indicated that the license was suspended and that Powell had "priors" for armed robbery. This latter information, known as "caution data," comes from a computer database and is communicated to police in Seat Pleasant anytime a person has ever been charged with a crime, no matter when the charge was made or its disposition. Regarding "priors" generally, Officer Shelby explained: "It's just a prior. It doesn't mean that they [sic] up to the same activity, but at which time you still have to take that into consideration, that they may still be armed or may still be conducting the same business." J.A. 53. Regarding Powell's "priors" specifically, Officer Shelby explained that he "had no way of knowing whether that was yesterday's news or 15 years ago news," and "[n]o way of knowing whether that was a conviction or an exoneration." *Id.*

At the time the caution data was broadcast, neither Powell nor the other occupants of the Buick had appeared suspicious or presented any threat or problem to the officers. Nonetheless, based solely on the caution data, Officer Shelby ordered Powell from the Buick and began to perform a patdown on him. During the patdown, Powell became nervous and twice dropped to one knee.[3] Thereafter, Powell unsuccessfully

---

[3]At oral argument, the Government asserted for the first time that Powell was nervous before the patdown began. For support, the Government pointed to the district court's observation that "[t]here is some testimony that [Powell] appeared to be somewhat nervous." J.A. 88. Read in context, the court's observation clearly refers to Powell's demeanor *after* the patdown began, *see id.* (lines 2-7), and this reading is consistent with the evidence in the record. *See, e.g.*, J.A. 19-20 (Officer Davis' testimony that Powell "was being cooperative" but "seemed a little bit nervous" while the patdown was occurring); J.A. 49 (Officer Shelby's testimony that Powell "kind of was nervous" after the patdown began).

attempted to run from the officers, but he only got a few steps before they regained control over him and placed him in handcuffs. At this time, Powell was not under arrest.

Once the officers secured Powell, Corporal Patterson removed a backpack from the Buick near where Powell had been sitting. After finding a handgun in the backpack, the officers arrested Powell. During a search incident to the arrest, the officers found the crack cocaine that forms the basis for his conviction. At the conclusion of the traffic stop, Mitchell was cited for the traffic violation, and he and Tawanda were permitted to leave. The Buick was left parked on the street.

## II

On appeal, Powell concedes the lawfulness of both the traffic stop and his subsequent removal from the Buick. *See Maryland v. Wilson*, 519 U.S. 408, 415 (1997) (holding that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop"). However, he contends that Officer Shelby unlawfully patted him down after he exited the Buick because the officers did not have a reasonable basis to suspect that he was armed and dangerous. Powell's argument is grounded generally in "the basic rule that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment - subject only to a few specifically established and well-delineated exceptions," *Arizona v. Gant*, 556 U.S. 332, 129 S.Ct. 1710, 1716 (2009) (citation and internal quotation marks omitted), and, therefore, before an officer "places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so," *Sibron v. N.Y.*, 392 U.S. 40, 64 (1968).

More specifically, Powell's argument is based on the holding in *Arizona v. Johnson*, 555 U.S. 323, 129 S. Ct. 781, 784 (2009), in which the Court extended the "stop and frisk" rule

announced in *Terry* to passengers in a routine traffic stop. The *Johnson* Court held: "To justify a patdown of the driver or a passenger during a traffic stop, . . . just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Id.* As Powell notes, at the time Officer Shelby began the patdown, his interaction with the officers had been entirely amicable and he (like the driver and other passenger) had been cooperative. Thus, in Powell's view, the officers lacked reasonable suspicion that he was armed and dangerous.

Although the Government presented several arguments below, its only written appellate argument is that the officers had reasonable suspicion to conduct the patdown. *See Brief of United States*, at 9 (noting that "the sole disputed issue is whether Officer Shelby reasonably suspected that Powell was armed and dangerous").[4] In its appellate brief, the Government specifically points to two factors to support its contention: the caution data regarding Powell and Powell's purported deliberate misrepresentation concerning the validity of his driver's license. *See, e.g.*, *id.* at 1, 21. According to the Government: "Officers cannot be expected to blind themselves to obvious risks of danger when a person they encounter demonstrates a willingness to be untruthful, especially when there is information that the person has been involved previously in violence." *Id.* at 21.

---

[4]The Government also argued below that Powell lacks standing to challenge the search of the Buick, the search of the Buick was a lawful inventory search, and the search of Powell following his arrest was lawful as incident to the arrest. At oral argument, the Government also briefly asserted that Powell's attempt to flee constitutes a separate crime justifying the search. *See United States v. Sprinkle*, 106 F.3d 613, 619 (4th Cir. 1997) (holding that if a suspect responds to an illegal stop by committing a new, distinct crime, then the police constitutionally may arrest the suspect for that crime). By not presenting any of these arguments in its appellate brief, the Government has abandoned them. *See Snyder v. Phelps*, 580 F.3d 206, 216 (4th Cir. 2009), *aff'd*, 131 S.Ct. 1207 (2011).

The standards governing our determination of reasonable suspicion are well-defined. In the context of this case, reasonable suspicion is a particularized and objective basis for suspecting that the person to be frisked is armed and dangerous. *Ornelas v. United States*, 517 U.S. 690, 696 (1996).[5] "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27.[6] "The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior," *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000), and it is measured by the totality of the circumstances, *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

"The reasonable suspicion standard is an objective one, so we examine the facts within the knowledge of [the officers] to determine the presence or nonexistence of reasonable suspicion." *Digiovanni*, 650 F.3d at 511. "The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search." *Florida v. J.L.*, 529 U.S. 266, 271 (2000). The Government bears the burden of

---

[5]Reasonable suspicion is also the standard that justifies a *Terry* stop when an officer believes that criminal activity may be afoot. That determination differs from the one before us — *i.e.*, whether a lawfully detained person may be armed and dangerous and thus subject to a *Terry* frisk. *See Johnson*, 129 S.Ct. at 784. However, the general reasonable suspicion standard is the same in both instances.

[6]Of course, all roadside traffic encounters are potentially dangerous for law enforcement officers. *See Johnson*, 129 S.Ct. at 786-87. However, the inherent potential danger is not enough, by itself, to justify a patdown. *See Ybarra v. Illinois*, 444 U.S. 85, 93-94 (1979) ("Nothing in *Terry* can be understood to allow a generalized 'cursory search for weapons' or indeed, any search whatever for anything but weapons. The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked. . . ."); *United States v. Burton*, 228 F.3d 524, 529 (4th Cir. 2000) (noting that "in the absence of reasonable suspicion, an officer may not frisk a citizen merely because he feels uneasy about his safety").

articulating facts sufficient to establish reasonable suspicion, *Burton*, 228 F.3d at 528, and although the standard of proof "is obviously less demanding than that for probable cause," the government "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch," *United States v. Sokolow*, 490 U.S. 1, 7 (1989). As we recently explained:

> [T]he Government must do more than simply label a behavior as "suspicious" to make it so. The Government must also be able to articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance.

*Foster*, 634 F.3d at 248.[7]

We review the district court's reasonable suspicion determination *de novo*, bearing in mind that reasonable suspicion is to be determined on a case-by-case basis, and thus one determination will seldom be useful precedent for another. *Ornelas*, 517 U.S. at 698-99. Applying the foregoing standards to the facts of this case, we have no hesitation in concluding that the Government has failed to meet its burden of establishing that the officers had reasonable suspicion that Powell was armed and dangerous when the patdown began.

---

[7]Notably, Officer Davis testified that a patdown is conducted anytime an officer orders a person out of a vehicle. J.A. 32. Although this practice seems to run afoul of *Terry*, it does not *necessarily* do so because of the possibility (albeit remote) that Seat Pleasant officers order passengers out only when they believe them to be armed and dangerous. *See United States v. Tinnie*, 629 F.3d 749, 753 n.2 (7th Cir. 2011). Regardless, because our inquiry is an objective one, we are not concerned with the officers' subjective intent. *Id.*

III

We begin our analysis by viewing the traffic stop in its overall context. *See United States v. Branch*, 537 F.3d 328, 338 (4th Cir. 2008) ("Context is important in evaluating a reasonable suspicion determination."). The officers' interaction with Powell began as part of a routine traffic stop on a public road, and there is no evidence in the record that it occurred in either a high-crime area or at a similarly unsafe location. For much of the traffic stop, the four officers on the scene outnumbered the three occupants of the Buick. Before Officer Shelby began the patdown, Powell and the other occupants of the vehicle were entirely amicable and cooperative with the officers, they did not engage in any threatening or evasive conduct, and they did not display any of the tell-tale signs typically associated with illegal or dangerous activity (*e.g.*, evidence of drug-dealing, gang affiliation, or a possible concealed weapon). It is particularly telling that Corporal Patterson told Powell during the traffic stop that he was free to leave if he wanted, which is an implicit acknowledgement that he did not consider Powell to be armed and dangerous. *Cf. Johnson*, 129 S.Ct. at 788 ("Officer Trevizo surely was not constitutionally required to give Johnson an opportunity to depart the scene after he exited the vehicle without first ensuring that, in so doing, she was not permitting a dangerous person to get behind her.").[8]

Standing alone, this context clearly provides no basis for the officers to reasonably suspect that Powell might have been armed and dangerous. Until Powell was removed from the Buick, the traffic stop itself could be considered remarkable,

---

[8]Powell was "seized" when the stop occurred, but his initial seizure ended when Corporal Patterson gave him permission to leave. *See Brendlin v. California*, 551 U.S. 249, 256-58 (2007). However, Powell was again seized when Officer Shelby ordered him from the Buick for the patdown. *See Terry*, 392 U.S. at 16 (noting that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person").

if at all, only because of its amicable, cooperative, and relatively safe nature. Although we believe this context is important to a complete understanding of the issue before us, the inquiry does not end there. "A passenger's conduct may be sufficient to arouse reasonable suspicion, but it is not necessary when other factors are present." *United States v. Sakyi*, 160 F.3d 164, 169-70 (4th Cir. 1998) (citation omitted); *see also United States v. Holmes*, 376 F.3d 270, 278 (4th Cir. 2004) (noting that "a suspect's cooperation with police officers during a *Terry* stop does not, by itself, extinguish concerns that police may harbor about that suspect's dangerousness").

We therefore move further in our examination of the totality of the circumstances that were present when the patdown began. As noted, the Government has articulated two factors in its appellate brief to support its reasonable suspicion argument: the caution data and Powell's purported deliberate misrepresentation regarding his driver's license. We will separately address each of these factors before evaluating them together with the other circumstances of the traffic stop. *See Foster*, 634 F.3d at 246.[9]

Initially, we readily acknowledge that a person's possible involvement in prior criminal activity (*i.e.*, "caution data") can be relevant in establishing reasonable suspicion. *See, e.g.*,

---

[9]Perhaps recognizing the weakness of its written argument, the Government raised for the first time at oral argument two additional factors. First, the Government argued that Tawanda's failure to produce a license in response to Officer Shelby's query also supports reasonable suspicion about Powell. This argument borders on the nonsensical. The record is actually silent as to whether Tawanda heard Officer Shelby's question and, more importantly, as to the manner of her response, but even if we accept that Tawanda's conduct in this regard is somehow suspicious, we are at a loss to understand how her conduct has any bearing on whether *Powell* was armed and dangerous. Second, the Government contended that Powell was nervous before the patdown began. However, as we have noted, the record does not support this factual assertion. Therefore, we will not consider it. *See Foster*, 634 F.3d at 246 n.2.

*Holmes*, 376 F.3d at 278 (noting that reasonable suspicion "can be based on the suspect's commission of violent crimes in the past — especially when those crimes indicate a high likelihood that the suspect will be 'armed and dangerous' when encountered in the future). However, in most instances, "[a] prior criminal record is not, standing alone, sufficient to create reasonable suspicion." *Foster*, 634 F.3d at 246-47 (citation and internal quotation marks omitted); *see also Sprinkle*, 106 F.3d at 617 (noting that the officer knew the suspect had recently completed a drug sentence, but the officer had "no information that [he] had returned to crime since his release"). The rationale underlying this rule is clear:

> If the law were otherwise, any person with any sort of criminal record — or even worse, a person with arrests but no convictions — could be subjected to [an] investigative stop by a law enforcement officer at any time without the need for any other justification at all. To find reasonable suspicion in this case could violate a basic precept that law-enforcement officers not disturb a free person's liberty solely because of a criminal record. Under the Fourth Amendment our society does not allow police officers to "round up the usual suspects."

*United States v. Laughrin*, 438 F.3d 1245, 1247 (10th Cir. 2006) (citation and internal quotation marks omitted). The Tenth Circuit was addressing reasonable suspicion necessary for a *Terry* stop, but we believe its point applies with equal force to a determination of reasonable suspicion for a *Terry* frisk.

Officer Shelby's sole basis for frisking Powell was the caution data, *see* J.A. 54, but the Government unequivocally conceded at oral argument that the caution data, by itself, is insufficient to establish reasonable suspicion in this case. We believe that this concession is well-made because the caution data — while indicating that Powell had "priors" for armed

robbery — does not provide any detail concerning when the priors occurred or whether they even involved convictions. The striking lack of specificity of the information in this case draws no distinction between, for example, a recent armed robbery conviction and a decades-old wrongful armed robbery charge, and in the officers' view, such a distinction is irrelevant. Without more, the caution data certainly does not justify a reasonable suspicion that Powell was armed and dangerous on the night of the traffic stop.

We likewise acknowledge that false statements can be considered in establishing reasonable suspicion. *Branch*, 537 F.3d at 339 n.1. However, as with criminal background information, a false statement, without more, will typically be insufficient. *See, e.g.*, *United States v. Wilson*, 953 F.2d 116, 125 (4th Cir. 1991) (holding that "suspicious" falsehood was insufficient to establish reasonable suspicion "without stronger articulable grounds of ongoing criminal behavior"). Powell's purported misrepresentation — the suspiciousness of which is arguable — does not remotely tend to suggest that he was armed and dangerous. *See id.* ("Wilson's denial that he had just exited a plane from New York is suspicious, but of what is unclear. We are neither apprised of what, if any, significance such a falsehood normally has in the illicit drug trade, nor what inferences, if any, Officer Crooke drew from Wilson's denial of having arrived on the New York shuttle.").[10]

---

[10]It is actually questionable whether Powell can fairly be said to have deliberately misrepresented his license status at all. This is not a case where a suspect presented a false identification or a demonstrably untrue version of events. Even accepting, as we do, that Officer Shelby asked for a "valid" license, there is nothing in the record to establish that Powell heard the request for a "valid" license or understood its significance, or that he was aware that his license was in fact suspended. In any event, it strains credulity to believe that by *voluntarily* producing his license, Powell was attempting to mislead the officers. Moreover, we cannot help but note that under the Government's view, Powell's voluntary cooperation actually places him in a worse position than if he had simply refused to cooperate altogether. *See, e.g.*, *Florida v. Bostick*, 501 U.S. 429, 437 (1991) ("We have consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.").

Combining these factors and viewing them objectively in light of the other circumstances of this case does not aid the Government's position. We have already detailed the overall context of the traffic stop, which strongly militates against a finding of reasonable suspicion that Powell was armed and dangerous. Given the glaring weakness of the factors articulated by the Government, we are convinced that a reasonably prudent officer in these circumstances would not be warranted in the suspicion that Powell was armed and dangerous on the night of the traffic stop. Accordingly, the patdown was not permissible under the Fourth Amendment, and the district court should have suppressed the evidence that was seized during the traffic stop.

## IV

Based on the foregoing, we vacate the judgment of the district court.

*VACATED*

KING, Circuit Judge, dissenting:

I write in dissent because there was an ample basis — both particularized and objectively reasonable — for the suspicion that Powell, when he was patted down by Officer Shelby, may have been armed and dangerous. I therefore disagree with my distinguished colleagues and emphasize three essential points. First, there is a material distinction between an "investigatory stop" and a "patdown" (or "frisk") for weapons. Second, the "caution data" resulting from the computer check on Powell's invalid driver's license (revealing that Powell had been previously arrested for armed robbery) was alone sufficient to justify Officer Shelby's actions. And, third, viewed in their totality, the relevant circumstances more than justified Shelby's patdown of Powell for weapons.

## A.

Pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), the reasonable-suspicion standard applies to both an investigatory stop and a patdown for weapons. On the one hand, to justify an investigatory stop, there must be reasonable suspicion "that criminal activity may be afoot." *Terry*, 392 U.S. at 30. On the other hand, to support a patdown for weapons, there must be reasonable suspicion that a suspect "may be armed and presently dangerous." *Id.* These variances in the reasonable-suspicion standard owe to the fact that the predicate circumstances and ultimate goals of the two types of intrusions are different. An investigatory stop is for the purpose of detecting possible criminal activity, while a patdown for weapons is conducted solely for the safety of the police officers and others. Indeed, the consequences of either of these situations panning out into fact are distinct and, particularly in the patdown situation, fraught with danger. As the Supreme Court has explained, "[t]he purpose of [a patdown for weapons] is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Adams v. Williams*, 407 U.S. 143, 146 (1972); *see also Terry*, 392 U.S. at 29 ("The sole justification of the search in the present situation is the protection of the police officer and others nearby . . . .").

In *Florida v. J.L.*, 529 U.S. 266 (2000), the Supreme Court laid out the distinction between a *Terry* investigatory stop and a *Terry* patdown for weapons. After ruling that an investigatory stop may not be conducted solely on the basis of an anonymous tip that a person is armed, the Court explained that "the requirement that an anonymous tip bear standard indicia of reliability in order to justify a stop in no way diminishes a police officer's prerogative, in accord with *Terry*, to conduct a protective search of a person who has already been legitimately stopped." *J.L.*, 529 U.S. at 274. Recognizing the difference between a *Terry* stop and a *Terry* patdown for weapons, the Court thus stressed the importance of the offi-

cer's right to act in "'protection of himself and others'" when he is already lawfully on the scene and in the presence of a suspect. *Id.* at 270 (quoting *Terry*, 392 U.S. at 30); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977) (concluding that there was "little question" that officer was justified in conducting patdown for weapons after initiating lawful traffic stop, ordering suspect to exit vehicle, and noticing bulge in suspect's jacket).

When a police officer's life is on the line, common sense tells us that he should sooner be reasonable in his suspicion that a suspect may be armed and dangerous than in suspecting that a passerby is up to no good. The risk of dismissing a suspicion that a suspect may be armed is inherently perilous to arresting officers. As a result, the officers in this case were entitled to take reasonable steps to protect themselves and others after they received confirmation that Powell may be armed, even if that evidence might not have been sufficient for an initial *Terry* stop.[1]

### B.

### 1.

Although the requirement of reasonable suspicion for an investigatory stop or a patdown for weapons calls for more

---

[1]Each of the decisions relied on by the majority are materially distinguishable from this case, in that none focused on the legality of a patdown alone. We ruled in *Foster* and *Sprinkle* that officers' knowledge of the suspects' prior criminal involvement in drug activity failed to meet the reasonable-suspicion standard necessary for an investigatory stop. *See United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011); *United States v. Sprinkle*, 106 F.3d 613, 617 (4th Cir. 1997). *Massenburg* concerned whether reasonable suspicion existed to justify an investigatory stop and frisk of a pedestrian, and *Digiovanni* involved an investigation into drug trafficking activity that exceeded the scope of the original traffic stop. *See United States v. Massenburg*, 654 F.3d 480, 485-88 (4th Cir. 2011); *United States v. Digiovanni*, 650 F.3d 498, 507-10 (4th Cir. 2011).

than a mere hunch, reasonable suspicion is a lower standard than probable cause, and considerably lower than a preponderance. *See United States v. Massenburg*, 654 F.3d 480, 485 (4th Cir. 2011). In this case, the "caution data" regarding Powell, standing alone, satisfied that standard.

It is of little moment that, prior to the radio broadcast regarding the caution data on Powell, this traffic stop had been a cooperative one. *See ante* at 7. Officer Shelby confirmed that he asked Powell to exit the vehicle and that he conducted the patdown "for officer safety," after being advised of the Powell caution data involving armed robbery. J.A. 48.[2] With evidence that Powell may have been dangerously armed in the past, Officer Shelby made a "rational inference[ ]" that Powell may have been armed and presently dangerous, and Shelby acted — as he was entitled to do — to protect himself and others. *See United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008). In this context, it makes sense, as Judge Wilkinson has well explained, for the courts to "give due weight to common sense judgments reached by officers in light of their experience and training" and "credit the practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004) (internal quotation marks omitted) (citing *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)).

Furthermore, the government attorney's statement at oral argument that the "caution data" alone was insufficient to establish reasonable suspicion for the patdown of Powell constitutes a thin reed for the majority — because the question we face is not factual, but legal. *See United States v. Rodriquez*, 433 F.3d 411, 415 n.6 (4th Cir. 2006) (recognizing that court not bound by party's concession on legal issue). I simply disagree with the government on this point, and

---

[2]Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

instead find myself in agreement with the district court.[3] Put succinctly, I am loath to conclude that a police officer who has lawfully stopped a vehicle is not entitled to subject a passenger to a protective patdown for weapons after learning that, in the past, that passenger had been charged with an armed robbery.

2.

Notwithstanding my view of the sufficiency of the "caution data" concerning Powell, we are obliged to resolve the reasonable suspicion issue by considering the totality of the relevant circumstances. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002). In so doing, the facts underlying Officer Shelby's patdown of Powell for weapons persuade me that the district court's decision to deny suppression was entirely proper. Indeed, this case is informed by the Supreme Court's decision in *Pennsylvania v. Mimms*, where police officers stopped a vehicle with an expired license plate and asked the driver to step outside the car. *See* 434 U.S. 106, 107 (1977). When one of the officers noticed a "large bulge" under the driver's jacket, he patted the driver down in fear that the bulge may be a weapon, which it was. *Id.* The Court held that the patdown was justified. *Id.* at 112.

The facts of this case are even more compelling. Powell had previously been arrested for armed robbery, and the

---

[3]In ruling on the reasonable suspicion issue following an evidentiary hearing, the able and experienced district judge explained that

> there's certainly no issue in this case that the stop was legitimate, that requesting the individuals to get out of the vehicle was legitimate. At that point, knowing that the defendant had involvement in a prior charge, if not conviction of armed robbery, a pat-down was appropriate. The officers had no obligation to verify whether in fact it was a conviction that stuck. So the pat-down was appropriate.

J.A. 89.

police radio broadcast of the computer data specifically advised all three officers present of the Powell "caution data." Additionally, Powell indicated that he had a valid license but presented the officers with a suspended license, and he was a passenger in a vehicle where neither the driver nor the other passenger possessed a valid license. As a result, the officers were entitled — using their common sense — to believe that Powell was being untruthful when he purported to have a valid license, and that he engaged in "less than law abiding conduct." *See United States v. Pack*, 612 F.3d 341, 361 (5th Cir. 2010) (observing that "licenses are usually suspended for less than law abiding conduct"). The foregoing circumstances, taken together, provided an objectively reasonable basis for Officer Shelby's suspicion that Powell may have been armed and dangerous.[4] Consequently, there was ample justification for Officer Shelby's patdown of Powell for weapons, thus ensuring the safety of the officers and the vehicle occupants.

   I respectfully dissent.

---

[4]It is unnecessary to consider against Powell the evidence that, after the patdown decision was made, he sought to evade Shelby's patdown for weapons by dropping to his knees and then seeking to flee. *Cf. United States v. Sprinkle*, 106 F.3d 613, 619 (4th Cir. 1997) (concluding that suspect's intervening illegal acts during impermissible patdown provided independent grounds for arrest). Neither, of course, have I considered the fact that a 9mm Ruger handgun, as well as drugs, were then seized.