Dissenting Opinion by
Watts, J.,
which Battaglia, J., joins
Respectfully, I dissent. Upon review of the facts and circumstances of this case and the relevant case law governing Terry[1] frisks, I would affirm the decision of the Court of Special Appeals, affirming the Circuit Court for Anne Arundel County’s (“the circuit court’s”) denial of the motion to suppress, and hold that law enforcement officers had reasonable articulable suspicion to frisk Donzel Sellman (“Sellman”), Petitioner. The resolution of this case does not augment or enhance existing stop-and-frisk case law. It demonstrates only a disagreement between the Majority and the Court of Special Appeals and the circuit court as to the analysis of the facts of the case under existing case law. I would hold that the circuit court and the Court of Special Appeals properly applied the law to the facts, and reached the correct result. Because the evaluation of any Terry frisk — and, particularly this one — is fact-dependent, the facts underlying the case are set forth in detail below. As with the Majority opinion, the facts are derived from the suppression hearing that the circuit court conducted.
During the hearing on the motion to suppress, Corporal William Daughters (“Corporal Daughters”), a twenty-four-year veteran of the Anne Arundel County Police Department, testified to the following sequence of events. On November 12, 2013, at approximately 1:49 a.m., Corporal Daughters and Officer Daniel Kramer (“Officer Kramer”) (collectively, “the *564 officers”), a recruit trainee, were patrolling the Villages at Marley Station apartment complex in Glen Burnie. Corporal Daughters testified that there had been multiple thefts from vehicles, drug arrests, illegal handgun possessions, and a shooting at the apartment complex. During the course of the patrol, Corporal Daughters observed Sellman emerge from a “dark area on the side of’ an apartment building where there was no entrance. According to Corporal Daughters, Sellman came to an abrupt stop and seemed startled when he noticed the officers’ marked law enforcement vehicle. Sellman quickly turned to the right and stopped again, watching the patrol vehicle as it passed. Sellman then resumed a normal pace and proceeded toward the roadway. Shortly thereafter, Corporal Daughters observed Sellman get into a vehicle that had pulled up next to Sellman on the roadway. The officers followed the vehicle and noticed that it had a broken rear-right tail light lens and that the tag light was hanging from a wire below the bumper. Corporal Daughters activated the patrol vehicle’s emergency lights and pulled the vehicle over.
Corporal Daughters told the driver of the vehicle, Samantha Gillespie (“Gillespie”), that he had pulled her over due to the broken tail light lens and tag light. Upon shining his flashlight into the vehicle, Corporal Daughters noted a total of four individuals, including Sellman, who was seated in the left-rear passenger seat. Corporal Daughters asked if anyone in the vehicle lived in the Villages at Marley Station apartment complex, and only a female passenger, Andrea Queen (“Queen”), answered affirmatively. Sellman did not respond. Corporal Daughters asked Gillespie if there were “any guns, bombs, weapons, dead bodies” in the vehicle, and she answered “no.” Corporal Daughters then asked if they could search the vehicle, and, according to the officers, Gillespie answered, “I don’t care.” As Corporal Daughters started to approach the vehicle, Gillespie asked, “Why do you want to search the vehicle?” Corporal Daughters responded that they “had some problems in the area with some thefts and some drugs” and Gillespie answered that she understood.
*565 Before conducting the search, Corporal Daughters asked Gillespie whether Sellman also lived in the Villages at Marley Station apartment complex, and she answered affirmatively. Corporal Daughters testified that, because of the inconsistencies regarding who actually lived in the apartment complex and “the history surrounding the apartment complex, [he] wanted to identify everyone in the vehicle.” Corporal Daughters returned to the vehicle and asked for identification from the remaining three passengers. One male passenger, Donald Harris, had a State-issued identification card, but Queen said that she did not have identification. Corporal Daughters testified that, throughout the stop, Sellman sat rigidly in his seat and looked straight ahead. When Corporal Daughters asked for his information, Sellman turned toward Corporal Daughters and provided the name “Marcus Neal Saunders” and a date of birth of July 12, 1982. A warrant search of all of the passengers came up negative, but the officers could not find a “Marcus Neal Saunders” in the database.
Wfiiile the warrant checks were processing, Corporal Daughters requested that another officer, Officer Miller, join him and Officer Kramer at the stop. Corporal Daughters testified that he asked Officer Miller to come because there were four people in the car and only two officers. Additionally, Corporal Daughters testified that he wanted to check the parking lot where the vehicle had been to see if any vehicles had been broken into. Once Officer Miller arrived, he and Corporal Daughters approached the vehicle, and Corporal Daughters asked Sellman whether he had given Corporal Daughters the correct name, explaining that “something should come back” when the officers put his name into their dátabase. Sellman replied that he had provided the correct name and that he must not be showing up in the database because he had never been arrested and had never had a driver’s license.
Corporal Daughters asked Sellman to step out of the vehicle and place his hands on the trunk. During Corporal Daughters’s testimony, the following exchange occurred:
[PROSECUTOR:] ... [W]hat did you tell [Sellman]?
*566 [CORPORAL DAUGHTERS:] I had him step out of the vehicle and asked him to place his hands on the trunk of the car.
[PROSECUTOR:] And why did you do that?
[CORPORAL DAUGHTERS:] At that point, I had again conflicting stories about who had been picked up where, whether anybody at all lived in the apartment complex, if anybody. It was odd that they were driving through the parking lot, picking people up on foot at that hour of the morning.
[PROSECUTOR:] Right.
[CORPORAL DAUGHTERS:] And before I continue any further, or continue to a search of the vehicle, which Ms. Gillespie allowed us to do, I wanted to make sure none of the passengers were carrying any weapons.
Corporal Daughters testified that, as he conducted the Terry frisk’ of Sellman, he felt the impression of a gun where Sellman’s belt buckle would be. Corporal Daughters removed a semiautomatic handgun from Sellman’s waistband. A subsequent search revealed drugs, including cocaine, on Sellman’s person. Officer Kramer, who was no longer a law enforcement officer at the time of the hearing on the motion to suppress, testified at the hearing and concurred with Corporal Daughters’s description of the events as they occurred on November 12, 2013.
During the hearing on the motion to suppress, Gillespie disputed much of Corporal Daughters’s testimony. Gillespie testified that the damage to the vehicle was barely visible and that the officers had to crouch down to show her what needed to be repaired. Gillespie characterized the Corporal Daughters’s behavior toward the occupants of the vehicle as “pretty mean[,]” and she testified that she unequivocally told the officers “no” when they asked to search the vehicle. Gillespie also testified that warrant check took approximately twenty *567 minutes, which conflicted with Corporal Daughters’s and Officer Kramer’s testimony at the hearing.[2]
The circuit court found that the frisk of Sellman was valid for the following reasons: (1) the passengers in the car outnumbered the officers; (2) the stop occurred late at night in a high-crime area; (3) the officers observed Sellman coming from a dark area; (4) the officers became suspicious of Sellman based on his behavior in the vehicle; and (5) the officers “had a reasonable articulable suspicion at that point to do the [frisk]” of Sellman. Additionally, the circuit court found that the length of the stop was valid because Gillespie consented.
Sellman noted an appeal, and in an unreported opinion, the Court of Special Appeals affirmed the circuit court’s denial of the motion to suppress. Specifically, the Court of Special Appeals determined that Sellman’s suspicious behavior, combined with his presence late at night in a high-crime area, was “sufficient to arouse reasonable suspicion, in the eyes of an experienced law enforcement officer, that [Sellman] had committed or was planning to commit a crime.” The Court of Special Appeals also remarked that Corporal Daughters’s “concern that [Sellman] had broken into cars supported a reasonable suspicion that he was armed.”
In the instant case, I would hold that Corporal Daughters had reasonable articulable suspicion to believe that criminal activity may have been afoot and to believe that Sellman may have been armed and dangerous. In evaluating whether a frisk of an individual is warranted, the Court must balance “the need to search (or seize) against the invasion which the search (or seizure) entails.” Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (citation and internal quotation *568 mark omitted). As the Supreme Court has explained, “in justifying the particular intrusion the [law enforcement] officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. ... Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches[.]” Id. at 21-22, 88 S.Ct. 1868, 1884 (footnote omitted). Considering the totality of the circumstances, I would conclude that the following factors establish sufficient reasonable articulable suspicion to support denial of the motion to suppress: (1) the stop occurred late at night in a high-crime area; (2) specifically, Corporal Daughters testified that there had been multiple thefts from vehicles, a shooting, illegal handgun possessions, and drug arrests at the apartment complex; (8) Sellman behaved nervously before and during the stop; (4) specifically, Sellman came out of the darkened area of the apartment complex, made evasive movements upon seeing the law enforcement vehicle, and behaved nervously within the vehicle during the stop; (5) Gillespie advised that Sellman lived at the apartment complex, while Sellman did not respond when Corporal Daughters asked if anyone in the vehicle lived at the apartment complex; and (6) Sellman provided false identification to Corporal Daughters.
As the Supreme Court has incisively observed, “traffic stops are especially fraught with danger to [law enforcement] officers.” Arizona v. Johnson, 555 U.S. 323, 330, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009). Indeed, “the risk of a violent encounter in a traffic-stop setting stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop.” Id. at 331, 129 S.Ct. 781, 784 (citation and internal quotation marks omitted). In considering potential risks to officer safety, I would agree with the circuit court that the area in which this stop occurred is a salient factor in assessing the “whole picture.” Stokes v. State, 362 Md. 407, 416, 765 A.2d 612, 616 (2001) (citation and internal quotation marks omitted). As noted above, when, as in this case, a stop occurs in a high-crime area, “officers are not *569 required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.” Henson v. United States, 55 A.3d 859, 867-68 (D.C.2012) (citation and internal quotation marks omitted). Indeed, Corporal Daughters testified that there had been a shooting and other weapon and drug-related offenses at the apartment complex. Thus, the possibility of encountering an armed and potentially dangerous individual was a present concern at the time of the stop.
Turning to Sellman’s behavior, in light of the testimony at the suppression hearing, I would conclude that Sellman exhibited nervousness, both prior to and during the course of the stop — certainly behavior that contributed to the establishment of reasonable articulable suspicion for the frisk. In so concluding, I would not grant greater weight to nervousness as a factor in a totality of the circumstances analysis than this Court has previously. Rather, consistent with prior holdings, I would note that nervousness alone is not dispositive in a determination of reasonable suspicion; however, persistent nervousness is a factor that this Court should consider as part of the totality of the circumstances. See United States v. Simpson, 609 F.3d 1140, 1148 (10th Cir.2010) (“Extreme and persistent nervousness, however, is entitled to somewhat more weight.” (Citations and internal quotation marks- omitted)).
Although Sellman was not shaking like the defendant in Simpson, id. at 1145, he exhibited nervous and evasive behavior prior to and during the stop. Corporal Daughters testified that when the officers first observed Sellman step out from the shadows of the apartment complex, Sellman stopped, quickly changed course, and then stopped again after seeing the marked law enforcement vehicle. Sellman’s reaction to the law enforcement vehicle was made more suspicious by his emergence from a dark area of the apartment complex where there was no entrance. As with many factors that the Court considers as part of the totality of the circumstances, an individual’s presence in a dark area alone does not give rise to the suspicion that they are armed and dangerous. See Bailey v. State, 412 Md. 349, 368, 987 A.2d 72, 83 (2010) (“Although *570 the encounter took place at nighttime, the [defendant] was alone and the officer ‘could visibly see his hands,’ which, presumably because the officer did not indicate otherwise, were empty.”). This Court has, however, noted that it will consider such factors as part of the totality of the circumstances. Indeed, in Ransome v. State, 373 Md. 99, 110, 816 A.2d 901, 907 (2003), this Court explained that we consider whether an individual appears to be hiding or “lurking” in a dark area as a factor when determining whether an officer had reasonable suspicion to believe the individual was armed and dangerous.[3] In this case, Sellman’s nervous behavior immediately after emerging from a dark side of a building where there was no entrance is a pertinent consideration in the analysis.
*571 Sellman’s behavior during the stop also bears on the determination as to reasonable suspicion for the frisk. Corporal Daughters testified that, throughout the course of the stop, Sellman sat “completely rigid in his seat, he had his hands on his knees and was looking straight ahead and never turned his head once.” Corporal Daughters indicated that this behavior was unusual. In assessing whether an individual’s nervousness is beyond the usual level, the United States Court of Appeals for the Tenth Circuit has credited the opinion of the law enforcement officers who observed the nervous behavior. See Simpson, 609 F.3d at 1148 (The law enforcement officer “did not merely assert that [the defendant] was nervous, he provided a basis for that conclusion — [the defendant] was shaking uncontrollably throughout the entire encounter, even when assured he would not get a ticket. ... [W]e credit as a factor towards reasonable suspicion, albeit cautiously, [the defendant]^ manifestation of extreme nervousness.”). In this case, the circuit court found Corporal Daughters’s testimony credible, and, as such, Corporal Daughters’s characterization of Sellman’s nervousness as unusual is a relevant factor to be considered in determining the existence of reasonable suspicion.
Of particular significance in the present case is Sellman’s provision of false identification to Corporal Daughters. Indeed, the circumstances of this case closely mirror those in cases in which other courts have determined reasonable suspicion existed based partially on the provision of false identification. See, e.g., United States v. Richmond, 641 F.3d 260, 261 (7th Cir.2011) (During a conversation with a law enforcement officer, “[a]fter [the defendant] denied having any identification on him, [the officer] asked [the defendant] his name. ... [the defendant] lied. A database search through the squad car’s mobile computer reported ‘no record on file,’ which [the officer] knew to be particularly unusual and potentially indicative of a false name.”). Here, when the officers ran the name and date of birth that Sellman provided through the database, no information came back, “as if [the name] [did not] exist.” I would agree with the United States Court of Appeals for the *572 Seventh Circuit that an individual’s provision of false identification bears on considerations of officer safety. See Richmond, 641 F.3d at 262 (“The ‘no record on file’ report generated by the pseudonym indicated that [the defendant] might have been trying to hide information.” (Citation omitted)). Indeed, such circumstances rightfully raise a law enforcement officer’s suspicion that the individual with whom he or she is speaking might have a “dangerous reaction to confrontation^]” Id.
This case is distinguishable from United States v. Powell, 666 F.3d 180, 185, 189 (4th Cir.2011), in which the United States Court of Appeals for the Fourth Circuit held that an individual’s provision of inconsistent information regarding the validity of his license did not establish reasonable suspicion that he was armed and dangerous. Unlike Sellman, the defendant in Powell, id. at 184, did not display any nervous or evasive behavior and was very forthcoming with the law enforcement officers. Furthermore, the defendant in Powell, id. at 189, did not attempt to give a false name, and the Fourth Circuit expressed doubt that his claim as to the validity of the license was itself suspicious. By contrast, it is not in dispute that Sellman provided the name “Marcus Neal Saunders” to Corporal Daughters when asked for his name. Even after Corporal Daughters informed Sellman that the name returned no information in the database, Sellman insisted that he had given the correct name, further heightening Corporal Daughters’s suspicion. Thus, the circumstances of the present case are distinguishable from Powell, as the defendant in Powell did not provide a false name to law enforcement officers, did not continue to insist that the name was accurate after a database search, and did not appear nervous before and during the course of the stop.
In its unreported opinion, the Court of Special Appeals explained that Corporal Daughters had reasonable articulable suspicion to believe that Sellman was involved with criminal activity:
The totality of these circumstances, viewed in the light most favorable to the State, was sufficient to arouse reasonable suspicion, in the eyes of an experienced law enforcement *573 officer, that [Sellman] had committed or was planning to commit a crime. Indeed, Corporal Daughters asked another officer to check the parking lot, in the area where there had been thefts from cars, to see if any cars had been broken into. The concern that [Sellman] had broken into cars supported a reasonable suspicion that he was armed.
(Citations omitted). Before this Court, Sellman contends in the alternative that, even if this Court finds that the officers had reasonable articulable suspicion to believe that he had committed theft from a vehicle, such a crime does not presume the use of a weapon.
Whether theft from a vehicle is a crime that could be presumed to involve the use of a weapon appears to be a matter of first impression for this Court.[4] The issue has not been thoroughly explored by other jurisdictions. The Majority declines to take a position with respect to the presumption of the use of a weapon, and reiterates that a determination of reasonable suspicion depends on the totality of the circumstances. See Maj. Op. at 562, 144 A.3d at 792-93. In declining to take a position, the Majority necessarily refrains from establishing new precedent.
A review of case law suggests, however, that theft from a car could be presumed to entail the use of a weapon or tools *574 that could present a danger to law enforcement officers. Indeed, it has been established that individuals have been known to utilize potentially dangerous instruments, such as screwdrivers, in perpetrating thefts from vehicles. See United States v. Williams, 525 Fed.Appx. 330, 331 (6th Cir.2013) (Law enforcement officers identified “common automobile ‘burglary tools’ — gloves, a flashlight, and a screwdriver — in plain view near [the defendant’s] seat.”). In Anderson v. State, 328 Md. 426, 440, 614 A.2d 963, 969 (1992), this Court noted that whether items that are not legislatively deemed weapons per se constitute “weapons” for the purpose of a conceal-and-carry analysis is “a question of fact, [determined] by applying the common experience of persons in our society to the facts and circumstances in a given case.” Although a screwdriver is not considered a weapon per se and has many perfectly legal uses, it can be employed as a weapon when wielded with intent to injure. See United States v. Lavender, 224 F.3d 939, 941 (9th Cir.2000) (The United States Court of Appeals for the Ninth Circuit categorized a screwdriver as a “dangerous weapon” for the purpose of upholding a sentencing enhancement for a robbery conviction, noting that “[t]here is no doubt that a screwdriver can be used to... caus[e] serious bodily injury.”).
In United States v. Bullock, 510 F.3d 342, 347 (D.C.Cir.2007), the United States Court of Appeals for the District of Columbia Circuit (“the D.C. Circuit”) noted that instruments that are not considered weapons per se may still present a threat to law enforcement officers and, therefore, justify a Terry frisk. In Bullock, 510 F.3d at 347, a law enforcement officer conducted a Terry frisk of the defendant during a traffic stop after forming reasonable suspicion that the defendant had stolen the vehicle. The D.C. Circuit upheld the permissibility of the frisk, concluding that, “[l]ike burglary, car theft is a crime that often involves the use of weapons and other instruments of assault that could jeopardize [law enforcement] officer safety, and thus justifies a protective frisk under Terry to ensure officer safety.” Bullock, 510 F.3d at 347 (emphasis added). Although Bullock involved theft of a vehicle rather than theft from a vehicle, as in the current case, the *575 instruments that are used in either circumstance are presumably the same. Thus, the D.C. Circuit’s reasoning in Bullock is instructive.
Sellman argues that this case is analogous to Simpler v. State, 318 Md. 311, 321, 312-13, 568 A.2d 22, 26-27 (1990), in which this Court concluded that the minor offense of underage drinking did not justify a Terry frisk. I would conclude that this case is distinguishable from Simpler. As discussed above, theft from a vehicle, unlike underage drinking, may involve the use of instruments that could present a danger to law enforcement officers. Additionally, other courts have held that suspicion of a theft crime may justify a Terry frisk if the officer believes that his or her safety may be at risk in apprehending the individual. See, e.g., United States v. Griffin, 696 F.3d 1354, 1359, 1357 (11th Cir.2012) (The United States Court of Appeals for the Eleventh Circuit upheld the constitutionality of a Terry frisk of an individual who was suspected of theft from a clothing store.). Simpler, a case involving underage drinking, provides little guidance as to the resolution of this matter.
The Majority theorizes that a general concern about theft from cars in an area does not provide reasonable suspicion that criminal activity is afoot and does not provide sufficient reasonable suspicion for a frisk. See Maj. Op. at 544-46, 144 A.3d at 781-83. Here, a concern about theft from cars was but one aspect of a myriad of factors giving rise to reasonable suspicion that criminal activity was afoot and that Sellman was potentially armed and dangerous. As recognized by the Majority, Sellman was observed coming from a dark area on the side of the apartment building where there was no entrance; the apartment building was in a high-crime area; Sellman behaved nervously upon seeing a law enforcement vehicle and was picked up at a location around the corner, separately from the other occupants of the vehicle; during the stop, Sellman appeared nervous in the vehicle, looking straight ahead and never looking at Corporal Daughters; Corporal Daughters received information from Gillespie that Sellman lived in the apartment complex, while Sellman did not respond; and Sell- *576 man provided a false name, “Marcus Neal Saunders,” for which there was no information or Motor Vehicle Administration record. Corporal Daughters’s testimony was that, after gaining consent to search the vehicle, he decided to frisk Sellman based on the responses of the occupants in the car and the circumstances that he had observed. Although Corporal Daughters, indeed, testified that, prior to searching the vehicle, he wanted to be sure that no one in the car was armed, the record establishes that he did not testify that this was the sole or primary basis for frisking Sellman.
At its core, the Majority opinion states that the law enforcement officers’ observations of Sellman “revealed innocent conduct” and that the officers did not have “an objective reason to support” the suspicion that Sellman was involved in criminal activity or was armed. Maj. Op. at 550-51, 144 A.3d at 786. To be sure, each factor observed by the officers — for example, nervousness, coming from a dark area, being in a high-crime area late at night, and Gillespie’s statement that Sellman lived at the apartment complex, coupled with Sellman’s failure to respond when Daughters asked if anyone in the vehicle lived at the apartment complex — does not constitute a crime in and of itself. It has never been required that reasonable suspicion be based on the observation of actual criminal activity. The entire underpinning of reasonable suspicion is that there are a totality of circumstances sufficient to give rise to the belief that criminal activity is afoot and an individual is armed and dangerous. In my view, such was the case here.
Although the need to protect citizens from unwarranted stops and frisks is of critical importance to the credibility of law enforcement and, ultimately, to the safety of the community, properly applying the law to the facts and evaluating the existence of reasonable suspicion are equally important.
In sum, viewing the evidence in a light most favorable to the State, I would conclude that, under the totality of the circumstances, the evidence is sufficient to establish that Corporal Daughters had reasonable articulable suspicion to believe that criminal activity was afoot and that Sellman presented a *577 danger to the officers at the time of the frisk. Thus, I would affirm the decision of the Court of Special Appeals, affirming the circuit court’s denial of the motion to suppress.
For the above reasons, respectfully, I dissent.
Judge Battaglia has authorized me to state that she joins in this opinion.

. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

. Corporal Daughters and Officer Kramer did not testify as to the length of the overall stop. Rather, the officers testified that each component of the stop occurred quickly. For example, Corporal Daughters testified that explaining the reason for the stop to Gillespie took between thirty seconds and one minute, and running Gillespie's identification through the database took five minutes. At the hearing, the prosecutor estimated that between eight and ten minutes passed during the traffic stop prior to the frisk.

. In his brief, Sellman contends that this Court's decision in Ransome should guide the analysis in this case. I would disagree. Indeed, the present case is distinguishable from Ransome in that Sellman's behavior (acting nervously toward the law enforcement officers after emerging from a dark area) was unusual. Although, in Ransome, 373 Md. at 109-10, 105, 816 A.2d at 907, 904, this Court held that the defendant’s nervousness, presence in a high-crime area, and appearance of having a bulge in his pocket did not establish reasonable suspicion that the individual was armed and dangerous, this Court specifically explained that the defendant was doing nothing unusual at the time the officers approached him:
Unlike the defendants in the cited cases, or indeed in Terry, [the defendant] had done nothing to attract [the law enforcement officers’] attention other than being on the street with a bulge in his pocket at the same time [a law enforcement officer] drove by. He had not committed any obvious offense, he was not lurking behind a residence or found on a day care center porch late at night, was not without identification, was not a known criminal or in company with one, was not reaching for the bulge in his pocket or engaging in any other threatening conduct, did not take evasive action or attempt to flee, and the officer was not alone to face him.
(Emphasis added).
By contrast, in this case, Sellman emerged from a dark area without an entrance outside a building of an apartment complex that was known to the law enforcement officers for violence and drug-related crime. He acted nervously as the officers passed by in the marked vehicle and, importantly, he subsequently provided a false name when questioned during the stop. Unlike the defendant in Ransome, Sellman's behavior was sufficiently unusual to establish reasonable suspicion that he could present a danger to the officers.

. As to the issue of crime that occurred in the apartment complex, the majority opinion minimizes the significance of Corporal Daughters's testimony that crimes occurred in the apartment complex in the time period leading up to November 12, the date of Sellman’s frisk. The majority opinion states that Corporal Daughters testified about crime that had occurred in the apartment complex and that those crimes occurred "at some unspecified time in the past.” Maj. Op. at 545, 144 A.3d at 783. The majority opinion further states: "There is no indication on the record of any reports of thefts from cars occurring that evening, that week, or even that month.” Maj. Op. at 546, 144 A.3d at 783. But concerning crime in the apartment complex, the record reflects that Corporal Daughters was asked: "[S]tarting on November 12 were there any problems in that area, up to that — leading up to the November 12[?]” To this question, Corporal Daughters responded that there had been multiple thefts from automobiles, shootings, handguns recovered, and drug busts in the apartment complex. Thus, Corporal Daughters’s description of the offenses was given in response to a question concerning the time period leading up to November 12.