**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 11 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

STANLEY WILLIAMS and OTIS
HATTEN,

    Defendants-Appellants.

Nos. 00-4039, 00-4040

(D. Utah)

(D.C. No. 98-CR-465-W)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TACHA**, Chief Judge, and **PORFILIO**, Circuit Judge, and **KANE**, District
Judge.[**]

_____

The defendants each entered a conditional plea of guilty to one count of possessing

a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(a)(1).

Each now appeals the district court's denial of their motions to suppress evidence found

in the vehicle in which they were riding following a traffic stop. We have jurisdiction

under 28 U.S.C. § 1291 and affirm.

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

[**] Honorable John L. Kane, Jr., United States District Judge for the District of
Colorado, sitting by designation.

**Background**

On September 2, 1998, Officer Richard Graham of the Emery County Sheriff's Office in Utah stopped a 1995 Honda minivan with Illinois plates for speeding on I-70. The driver, defendant-appellant Stanley Williams, exited the van and approached Graham as the officer pulled up behind the van. At this point, Graham activated a video camera and body microphone that recorded the remainder of the encounter.

Graham asked for Williams' driver's license and vehicle registration. Williams produced an Illinois license for himself and a vehicle registration identifying Kevin Minter of Illinois as the van owner. Upon determining that Williams was not the registered owner, Graham questioned Williams about his recent travels, his passenger and who owned the van. Williams responded that he and his cousin, defendant-appellant Otis Hatten, were coming from Las Vegas where they had spent two or three days at the New York, New York casino. He also stated that the van owner was Kevin Minter, whom he identified as his nephew.

Retaining Williams driver's license and registration, Graham checked the van's dashboard VIN through the windshield and then opened the van door to check the door VIN. Both matched the VIN on the registration provided by Williams.

With the van door standing open, Graham asked Hatten, who was still sitting in the van, for identification. Hatten produced an Illinois commercial license, which Graham retained. Graham asked Hatten who owned the vehicle and Hatten responded that his

cousin, a "distant relative," was the owner, but could not identify him by name. When Graham asked Hatten where he and Williams had been, Hatten responded they were coming from Los Angeles where they had spent two or three days sightseeing. Graham asked Hatten whether they spent any time in Las Vegas and Hatten said "no." When Graham questioned him again on this point, Hatten stated he and Williams had only stopped in Las Vegas for gas and to gamble for a short time.

Graham returned to Williams and asked him if he and Hatten had been anywhere other than Las Vegas. Williams responded they had been in Los Angeles for a few days before Las Vegas and mentioned visiting some of the same Los Angeles locations reported by Hatten. When asked about their travel to Las Vegas, however, Williams reiterated that he and Hatten had stayed in Las Vegas for two or three days. Graham then asked Williams for a telephone number where Minter, the van's registered owner, could be reached, and Williams provided a number.

Graham took the telephone number and defendants' documents to his patrol car and radioed the dispatcher to run computer checks to determine whether the van was reported as stolen on the National Crime Information Computer ("NCIC"), whether Williams' license was valid, whether Williams or Hatten were wanted (NCIC check) and whether they had criminal records (Triple I check). He also asked the dispatcher to call the number Williams had provided to ask Minter who had his van, how long that person or persons had had it and where they had been.

Graham proceeded to write up the speeding violation. While he was doing so, a backup officer arrived at the scene of his own accord. When the officer asked whether he had a mess, Graham said he might because the men did not own the car and gave conflicting stories about their recent travels.

Over a fifteen minute period, the dispatcher radioed Graham that Williams' and Hatten's licenses were valid and that the NCIC did not report the van as stolen. Although the NCIC check showed possible "hits" on the two men, Graham determined that these reports did not match Williams or Hatten. The Triple I check on Williams, however, indicated a history of serious offenses. The dispatcher did not reach Minter or report the results of the Triple I check on Hatten during this period.

As the information described above trickled in, Graham returned to Williams and then Hatten, explained that he was waiting on information regarding them and the vehicle and questioned them again on their travel itinerary. Each defendant continued to contradict the other regarding the time spent in Las Vegas. After receiving the Triple I report on Williams' criminal history, Graham also asked Williams whether he had ever been arrested. Williams first claimed to have a record of only minor traffic violations and then evaded Graham's follow up questions. By this time, Williams also appeared nervous.

Graham asked Williams if there were any weapons, alcohol, drugs, drug paraphernalia or large quantities of cash in the van. Williams said "no." Graham then

asked him: "While we're waiting for this information to come back, do you mind if we search your vehicle for those items?" Williams said "sure" and gestured his assent. Graham then asked similar questions of Hatten and asked Hatten if he could search the vehicle for those items. Hatten responded "Yes" or "I guess." Graham patted down both men and directed them to stand in front of the van.

Graham and the backup officer began searching the van, starting in the front passenger compartment and working back. Neither defendant objected to the search as it proceeded.

One or two minutes into the search, the dispatcher reported to Graham that he had been unable to contact Minter at the number given by Williams. As a result, the defendants' entitlement to operate the vehicle was not confirmed. At this time Graham also received the final piece of information for which he was waiting, which was the Triple I report on Hatten's criminal history. It indicated that Hatten had an extensive criminal record that included murder and other violent crimes.

After receiving the dispatcher's last report, Graham and the backup officer continued to search the van. When they reached the rear of the van, Graham noted that the carpeting in the rear cargo area appeared to have been altered and then glued down. When he checked the underside of the van below the cargo area, he detected what appeared to be a hidden compartment without visible means of access and with screws protruding from the inside pointing out. Graham's experience was that every secret or

hidden compartment he had encountered contained contraband.[1]  After unsuccessfully attempting to drill into the compartment, Graham discovered a plug on the underside of the compartment that, when removed, revealed several duct tape-wrapped packages in the compartment.  Graham immediately placed Williams and Hatten under arrest and then drilled into one of the packages through the plug opening.  This revealed a white powder that field tested positive for cocaine.  It was later determined that the hidden compartment contained 31 kilograms of cocaine.

Williams and Hatten were jointly indicted on one count of possession of a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(a)(1).  Each defendant filed a motion to suppress the evidence discovered during the officers' search of the van.  After an evidentiary hearing before the magistrate judge pursuant to an order of reference, the magistrate judge recommended that the district court deny both motions to suppress.  The district court affirmed the magistrate judge's report and recommendation and denied the defendants' motions.  Each defendant then entered a conditional plea of guilty under Fed. R. Civ. P. 11(a)(2), reserving the right to appeal the denial of their motions to suppress.  These appeals followed.

---

[1]     The compartment was originally designed to store the van's rear seat.  The magistrate judge found it had been altered to seal and hide it.  *See* Magistrate's Report at 27 & n.5.

**Discussion**

When reviewing a district court's decision on a motion to suppress, we accept its factual findings unless clearly erroneous and view the evidence in the light most favorable to those findings. *United States v. West*, 219 F.3d 1171, 1176 (10ᵗʰ Cir. 2000). The ultimate determination of whether a search and seizure is reasonable under the Fourth Amendment is a question of law we review *de novo*. *Id.*

Defendants assert that the district court erred in denying their motions to suppress because: (1) they were detained by Graham in violation of their Fourth Amendment rights; (2) this unlawful detention tainted and negated their consent to search the van; and (3) even if they were lawfully detained, Graham's search of the van violated their Fourth Amendment rights by exceeding the scope of their consent. We examine each assertion in turn.

A.     Lawfulness of Detention

A routine traffic stop is a seizure with the meaning of the Fourth Amendment. *United States v. Wood*, 106 F.3d 942, 945 (10ᵗʰ Cir. 1997). For purposes of constitutional analysis, we characterize such stops as investigative detentions and therefore analyze their reasonableness under the two-part inquiry for investigative detentions set forth in *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968). *Wood*, 106 F.3d at 945. First, we determine whether the stop was justified at its inception. *Id.* As neither defendant disputes this point on appeal, we proceed to the second part of the inquiry, which is whether the officer's actions during

-7-

the detention were reasonably related in scope to the circumstances that justified the interference in the first place. *See id.*

The permissible scope of an investigatory detention depends on the particular facts and circumstances of each case. *United States v. Holt*, 229 F.3d 931, 935 (10th Cir. 2000). In every case, however, the detention must "'last no longer than is necessary to effectuate the purpose of the stop' and 'be carefully tailored to its underlying justification.'" *Id.* (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Thus, "an officer conducting a routine traffic stop may run computer checks on the driver's license, the vehicle registration papers, and on whether the driver has any outstanding warrants or the vehicle has been reported stolen," but "once the computer checks confirm that the driver has produced a valid license and proof of entitlement to operate the car, the driver must be permitted to proceed on his way, without further delay by police for additional questioning." *Id.* (quoting *United States v. Mendez*, 118 F.3d 1426, 1429 (10th Cir. 1997)).

An officer may pose additional questions, and thereby expand a traffic stop beyond its original scope, if during the initial stop the officer acquires "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Galindo-Gonzales*, 142 F.3d 1217, 1221 (10th Cir. 1998) (quotation omitted).[2]

---

[2] An expanded detention is also permissible if the initial detention becomes a consensual encounter. *West*, 219 F.3d at 1176. Because Graham retained both Williams and Hatten's driver's licenses during his investigation, the detention in this case was non-

"The existence of objectively reasonable suspicion of illegal activity does not depend on any one factor, but on the totality of the circumstances." *Id.* (quotation omitted). Under *Terry*, the scope of an expanded investigative detention is limited to the circumstances that justified expanding the detention. *Id.*

The defendants initially contend that they were illegally detained because Graham's questions to them regarding their identities and travel itinerary were not reasonably related to the circumstances, *i.e.*, speeding, that justified the initial traffic stop. Even assuming that such questions are not constitutionally permissible during a routine traffic stop,[3] "a defining characteristic of our traffic stop jurisprudence is that the defendant's lack of a valid registration, license, bill of sale, or some other indicia of proof to lawfully operate and possess the vehicle in question gives rise to objectively reasonable suspicion that the vehicle may be stolen." *Galindo-Gonzales*, 142 F.3d at 1223 (quoting *United States v. Fernandez*, 18 F.3d 874, 879-80 (10th Cir. 1994)). As a result of this reasonable suspicion of criminal activity, "we have concluded that officers confronted

consensual. *See, e.g.*, *United States v. McKneely,* 6 F.3d 1447, 1451 (10th Cir. 1993).

[3]    This Court has on several occasions stated or implied that an officer may ask questions relating to the identity and/or travel plans of a detainee without exceeding the scope of a routine traffic stop. *See, e.g.*, *West*, 219 F.3d at 1176; *United States v. Rivera*, 867 F.2d 1261, 1263 (10th Cir. 1989). We recently expressed doubt over the constitutionality of this practice, however, where the questioning is unrelated to the purpose of the traffic stop. *See Holt*, 229 F.3d at 936 (majority decision); *see also id.* at 942 (difficult to explain how questions concerning travel plans are reasonably related to traffic stop for speeding)(Ebel, J. dissenting).

with a motorist who cannot produce proof of ownership may ask questions about the identity and travel plans of the driver and passengers." *Id.* at 1224.

In this case, as described earlier, Williams could not produce any indicia of his right to operate and possess the van in which he and Hatten were riding. Only then did Graham question first Williams and then Hatten about their identities and travel itinerary. Under these circumstances, Graham had the requisite reasonable suspicion of criminal activity to justify this questioning.

The defendants dispute this conclusion, and cite our decision in *United States v. Walker*, 933 F.2d 812 (10th Cir. 1991), to support their argument that Williams' production of a valid Illinois driver's license and Illinois registration for the vehicle, coupled with the Illinois plates on the vehicle and Williams' identification of the registered van owner by name, precluded any reasonable suspicion that the van was stolen, and therefore also precluded any questioning or investigation beyond what was required to ticket Williams for speeding.

In *Walker*, the defendant was also stopped for speeding in Emery County, Utah. When approached by the detaining officer, Walker produced papers demonstrating that his vehicle was registered to another person, a woman Walker identified as his sister. *Id.* at 814. At the hearing on Walker's motion to suppress, the officer testified that at this point he was satisfied as to Walker's right to operate the vehicle and that he did not suspect him of any criminal activity. *Id.* at 816. The officer nonetheless proceeded to ask

Walker a number of questions unrelated to the traffic stop and also unrelated to the possibility that the vehicle was stolen. *Id.* at 814.

The district court found that the officer's continued detention of Walker in order to ask these questions violated Walker's Fourth Amendment rights and suppressed evidence found during a subsequent consensual search of the vehicle. *Id.* In so doing, it found that Walker had produced sufficient proof demonstrating his entitlement to operate the vehicle such that no reasonable suspicion of criminal activity arose from the fact that the vehicle was not registered to him. *Id.* On appeal, we agreed with this conclusion, based largely on the officer's failure to investigate whether the car was stolen and the fact that if he had investigated this possibility he would have discovered that Walker had written proof of his entitlement to the car. *Id.* at 816. We therefore affirmed the district court's holding that Walker was unlawfully detained. *Id.* at 817.

Our decision in *Walker* does not support reversal of the denial of defendants' motions to suppress. When the registered owner of the vehicle is not present at a traffic stop, the driver's statement that he borrowed the vehicle from the registered owner does not, without more, prove his entitlement to the vehicle. *See United States v. Arango*, 912 F.2d 441, 443, 447 (10th Cir.1990) (driver who produced valid vehicle registration and said he borrowed vehicle from registered owner validly detained while officer tried to contact registered owner). In this circumstance, there is a reasonable suspicion that the vehicle is stolen and the officer may lawfully detain the driver to investigate this

-11-

possibility. *See id.*; *United States v. Miller*, 84 F.3d 1244, 1251 (10th Cir. 1996) (further investigation justified when officer has reasonable suspicion vehicle may be stolen). In the present case, unlike *Walker*, once the detaining officer learned that Williams was not the van's registered owner he took various steps to investigate whether the van was stolen, including questioning Williams and Hatten about their identities and travel itinerary.[4] This questioning produced repeated inconsistent statements from Williams and Hatten regarding their just completed stop in Las Vegas. The significant discrepancy in their stories, a factor not present in *Walker*, contributed to a reasonable objective suspicion of criminal activity justifying the officer's continued investigation and detention of the defendants. *See United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1484 (10th Cir. 1994) (inability of a driver to offer proof he is entitled to operate a vehicle, combined with inconsistent information about his travel history or destination, generally gives rise to a reasonable suspicion justifying further questioning and investigation).[5]

---

[4]    Graham's lawful investigation also included questions to the defendants regarding their relationship to the registered owner of the van and how to contact him and Graham's requests to dispatch that it attempt to contact the van's owner, run an NCIC check to determine if the van had been reported stolen and run NCIC and Triple I computer checks on Williams and Hatten.

[5]    Defendants also cite *United States v. Guzman*, 864 F.2d 1512 (10th Cir. 1988), *overruled on other grounds by United States v. Botero-Ospina*, 71 F.3d 783 (10th Cir. 1995), in which we found an expanded traffic stop unconstitutional, as analogous to this case. *Guzman* is distinguishable, however, because the driver in that case produced a rental agreement proving his entitlement to the vehicle. *See id.* at 1514, 1519. The defendants' reliance on *United States v. McSwain*, 29 F.3d 558 (10th Cir. 1994), is also misplaced because there was no question in that case regarding the driver's entitlement to the vehicle and the detaining officer there never had an objectively

-12-

As it continued, Graham's investigation also produced other factors that in combination supported a reasonable objective suspicion that some kind of criminal activity had occurred or was occurring. These included Hatten's inability to name the relative from whom he and Williams had allegedly borrowed the van, Williams' incomplete and evasive responses to Graham's questions regarding his criminal history and Williams' increasing nervousness.[6]

The defendants challenge the district court's reliance on these factors and on their inconsistent statements regarding their Las Vegas stop, arguing each could also be construed as innocent misstatements or actions and thus are not necessarily indicative of criminal activity. The possibility of an innocent explanation for one or more suspicious circumstances does not, however, render an investigative detention unconstitutional. *See Illinois v. Wardlow*, 528 U.S. 119, 125-26 (2000). Considered as a whole, the circumstances cited by the district court could also be explained as defendants' attempts to conceal criminal activity that had occurred or was occurring. The Fourth Amendment

reasonable suspicion that illegal activity had occurred or was occurring. *See id.* at 560, 561.

[6] We reject Hatten's contention that the district court was clearly erroneous in finding that Williams acted nervously as the detention progressed. This factual finding has support in the record and, after reviewing the videotape of the detention and Graham's testimony, we are not "left with the definite and firm conviction that a mistake has been committed." *Manning v. United States*, 146 F.3d 808, 812 (10th Cir. 1998) (defining "clearly erroneous" standard of review).

-13-

permitted Graham to detain the defendants to "resolve the ambiguity" raised by these circumstances. *Id.*

We also reject defendants' argument that they were illegally detained because any suspicion Graham had that the van was stolen, and hence any justification for an extended investigative detention, ended when Graham learned that the van had not been reported as stolen on the NCIC.[7] By the time Graham received this information, his lawful investigation had produced additional factors, including the defendants' contradictory statements of their travel itinerary, supporting a suspicion of criminal activity. The district court also found that the NCIC report on the vehicle did not eliminate the suspicion that it was stolen because of the delay in posting stolen vehicle reports to this service. This factual finding is supported by Graham's testimony and is not clearly erroneous. *Cf. Arango*, 912 F.2d at 443, 447 (where driver could not show entitlement to vehicle and vehicle not reported as stolen on NCIC, officer justified in detaining driver while attempting to contact vehicle's registered owners).

Finally, Hatten makes several arguments specific to his detention. First, he argues that Graham had no justification in asking for identification or running computer checks

_____

[7] At points in his briefs Hatten argues that Graham did not ask for or receive an NCIC report on whether the vehicle was stolen. Not only does Hatten contradict this argument by asserting elsewhere that the negative NCIC report should have ended Hatten's detention, but our review of the record indicates that the district court's findings on this point are not clearly erroneous as they are supported by Graham's testimony and not clearly contradicted by the videotape of the incident. Moreover, the absence of a stolen vehicle report is merely indicative, but not determinative of, the vehicle's status.

on him because he was only a passenger in the vehicle. This is incorrect as the objectively reasonable suspicion that the van was stolen justified further investigation, *see, e.g., Miller*, 84 F.3d at 1251, including determining and investigating Hatten's identity. *Cf. United States v. Ozbirn*, 189 F.3d 1194, 1200 (reasonable suspicion of criminal activity justified questioning passenger); *United States v. Alvarez*, 68 F.3d 1242, 1245 (10th Cir. 1995)(same). We also reject Hatten's claim that Graham violated his Fourth Amendment rights when he opened the van door to check the door VIN and to speak to Hatten. As this conduct was reasonably related to Graham's investigation into the possibility that the van was stolen, it did not exceed the permissible scope of the investigative detention. Lastly, Graham's frisk of Hatten for weapons just before beginning to search the van was permissible under *Terry* in light of the suspicion of criminal activity that existed at this point and the vulnerable positions Graham and the backup officer would assume as they searched the van. *See Terry*, 392 U.S. at 30 (officer may pat-down suspect for weapons when he suspects criminal activity and he has a reasonable fear for his own or others safety).

In the totality of these circumstances, we agree with the district court that there was a particularized and objective basis for suspecting Williams and Hatten of criminal activity and that Graham's actions during the detention were reasonably related in scope to the circumstances that justified the extended detention. As a result, defendants' detention was lawful under the Fourth Amendment.

B.      Consent to Search

The district court found, and the defendants do not dispute, that Williams and Hatten both consented to Graham's request to search their vehicle. Defendants contend, however, that this consent was tainted by their illegal detention and hence was not voluntary. As we have found that the defendants' detention was lawful, we need not consider this argument further.

The defendants also argue the search violated the Fourth Amendment because it exceeded the scope of consent. The scope of a consent to search is defined by its express object and limited by the breadth of the consent given. *United States v. Elliot*, 107 F.3d 810, 814-15 (10th Cir. 1997). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). The district court's determination of the scope of consent is a factual question we review for clear error. *West*, 219 F.3d at 1177.

It is undisputed that Williams acceded to the following request by Graham: "While we're waiting for this information to come back, do you mind if we search your vehicle for those items." The information Graham was referring to included the results of the Triple I computer check on Hatten's criminal record and the dispatcher's call to Kevin Minter, the registered van owner, to determine whether the van was stolen. The items

Graham referenced included weapons, drugs, large quantities of money and related items as enumerated by Graham in a preceding series of questions.

Defendants first argue that the resulting search exceeded the scope of consent because it continued after Graham received the Triple I report on Hatten and the results of the dispatcher's call to Minter. The district court held otherwise, finding that Graham's request to search, and hence Williams' affirmative response, was not time related or conditioned in any fashion on the receipt of this information from the dispatcher. In addition, the district court noted that Graham did not, in fact, receive the information he sought because the dispatcher had been unable to reach Minter. Thus, even if Williams' consent was limited as the defendants assert, Graham never received the information he was awaiting regarding Williams' entitlement to operate Minter's van. We concur that the defendants' Fourth Amendment rights were not violated when Graham and the back-up officer continued to search the van after Graham spoke to the dispatcher.

Williams also argues that Graham exceeded the scope of the consent, and thus engaged in an illegal search, when he removed the plugs from the bottom of the hidden compartment and drilled into it. We disagree. Williams gave Graham general consent to search the van for drugs, weapons and other enumerated items. "[W]here a suspect does not limit the scope of a search, and does not object when the search exceeds what he later claims was a more limited consent, an officer is justified in searching the entire vehicle."

-17-

*West*, 219 F.3d at 1177 (internal quotations omitted). Thus, Williams' consent authorized Graham to examine the rear of the van, including its underside.

This consensual search revealed the presence of a sealed, hidden compartment that appeared to have been disguised by newly glued carpet. This Court and others have found probable cause to search, without consent or warrant, where a hidden compartment is found and there is other evidence suggesting criminal activity. *See, e.g.*, *United States v. Anderson*, 114 F.3d 1059, 1066 (10th Cir. 1997) (collecting cases); *Arango*, 912 F.2d at 447. In this case, we agree with the district court that the discovery of a hidden compartment, combined with the other factors creating a suspicion of criminal activity, furnished probable cause to search the van without regard to the scope of defendants' consent. Where probable cause justifies the search of a vehicle, it also justifies the search of every part of the vehicle, including closed containers, that may conceal the object of the search. *See California v. Acevedo*, 500 U.S. 565, 572 (1991) (citing *United States v. Ross*, 456 U.S. 798 (1982)). Accordingly, even if Graham's drilling into the hidden compartment was beyond the scope of Williams' consent to search, this search was constitutional in light of the probable cause supporting it.[8] *See West*, 219 F.3d at 1178.

---

[8]   Having found probable cause to search the compartment, we need not consider Hatten's argument that he and Williams lacked apparent or actual authority to consent to the search of this compartment.

For the reasons stated above, the district court's denial of the defendants' motions to suppress the evidence from the search is AFFIRMED.

Entered for the Court

John L. Kane, Jr.
District Judge