**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 09-4901**

UNITED STATES OF AMERICA,

                    Plaintiff - Appellee,

          v.

DAVID BRAXTON,

                    Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore.   William  D.  Quarles,  Jr.,  District Judge.  (1:08-cr-00444-WDQ-1)

Argued:  September 22, 2011        Decided:  November 30, 2011

Before WILKINSON, WYNN, and FLOYD, Circuit Judges.

Affirmed  by  unpublished  opinion.    Judge  Wilkinson  wrote  the majority opinion, in which Judge Floyd joined.  Judge Wynn wrote a dissenting opinion.

**ARGUED:**  Warren  Eugene  Gorman,  Chevy  Chase,  Maryland,  for Appellant.  Michael Clayton Hanlon, OFFICE OF THE UNITED STATES ATTORNEY,  Baltimore,  Maryland,  for  Appellee.  **ON  BRIEF:** Rod J. Rosenstein,  United  States  Attorney,  Baltimore,  Maryland,  for Appellee.

Unpublished opinions are not binding precedent in this circuit.

WILKINSON, Circuit Judge:

Appellant David Braxton was convicted after trial of one count of possession of a firearm by a convicted felon. Because of the nature of his prior convictions, Braxton was subsequently given an enhanced sentence under the Armed Career Criminal Act. Braxton raises multiple issues in this appeal, including (among others) denial of his suppression motion, the ineffectiveness of his counsel, and violations of his statutory and constitutional rights to a speedy trial. We now affirm.

I.

On May 17, 2006, in Baltimore, Maryland, Baltimore City Police Officer Richard Allen observed a vehicle passing him with dark tinted windows. Officer Allen's radio check of the license plates revealed further that the tags belonged to another vehicle. After double-checking this information, Officer Allen obtained the assistance of two nearby plainclothes officers, and stopped the car. Officer Allen observed four occupants in the vehicle, and he approached the driver while one of the backup officers, Baltimore City Police Officer Kenneth Williams, approached the passenger side. Braxton was seated in the front passenger seat, and Officer Williams reported that, although the other passengers were complaining about being stopped, Braxton "looked very just nervous."

2

After discovering that the driver of the vehicle had a provisional license, which did not permit him to carry the passengers in the vehicle, Officer Allen asked everyone to get out of the car. When Braxton stepped out, Officer Williams advised him that he needed "to pat [him] down for weapons for safety." While frisking Braxton, Officer Williams felt a handgun, prompting him to yell "Gun," to alert his fellow officers to the danger of the situation. Braxton then elbowed Officer Williams in an attempt to escape, but he was subdued after a struggle with Officer Williams and another assisting officer.

Braxton was indicted by a grand jury in the District of Maryland on March 15, 2007 on one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). The case was assigned to Judge J. Frederick Motz and set for trial. Because Officer Allen deployed to Iraq in October 2007, the Government was forced to ask for continuances until, on September 16, 2008, Judge Motz decided to deny a further continuance and to dismiss the indictment without prejudice.

On September 17, 2008, the grand jury returned a second indictment of Braxton for the same felon-in-possession charge, and the new case was assigned to Judge William D. Quarles. On October 10, 2008, Braxton filed new motions to dismiss the

3

indictment and to suppress the gun discovered during the traffic stop. Those motions remained pending until March 16, 2009, the first day of trial, when the district court held a brief hearing and denied the motions. Braxton was convicted after a three-day jury trial.

At his sentencing hearing on September 4, 2009, Braxton objected to his classification as an armed career criminal under 18 U.S.C. § 924(e). He conceded that two of his prior convictions qualified as "serious drug offense[s]," but disputed the status of a third prior offense. After the government produced a certified conviction and certified charging document, the district court rejected Braxton's objection and sentenced him to 235 months' imprisonment. This appeal followed.

II.

We begin with Braxton's claim that the district court erred in refusing to suppress the firearm found by Officer Williams during the pat-down. Because the district court properly concluded that the encounter was a Terry stop, see Terry v. Ohio, 392 U.S. 1 (1968), not a consensual encounter, the frisk may only be justified if two independent criteria were satisfied. First, the police must have a reasonable suspicion "that criminal activity may be afoot," id. at 30, in order to make the stop in the first place. Second, the police must

4

similarly have reasonable suspicion "that the persons with whom [they are] dealing may be armed and presently dangerous" in order to justify "a carefully limited search of the outer clothing of such persons in an attempt to discover weapons." Id. This bifurcated analysis has led to separate terms for the permissible police actions: the "Terry stop" and the "Terry frisk," see, e.g., Florida v. J.L., 529 U.S. 266, 272-73 (2000).

In considering Braxton's challenge to the suppression ruling, we consider the district court's factual findings solely for clear error, but we review legal determinations de novo. See United States v. Hamlin, 319 F.3d 666, 671 (4th Cir. 2003). When a suppression motion has been denied, "[w]e construe the evidence in the light most favorable to the Government." United States v. Seidman, 156 F.3d 542, 547 (4th Cir. 1998).

A.

Here, the district court properly analyzed the justification for the investigative stop of the vehicle, finding explicitly that "[t]he lack of an appropriate tag on the vehicle, of course, is an appropriate basis for the Terry stop." Indeed, Braxton does not challenge the stop itself in this appeal. He does challenge the appropriateness of the frisk, however, and there, the district court did err.

In discussing the frisk, the district court appears to have misspoken, repeating the standard for the stop as the

5

appropriate analysis for the frisk: "[W]hen there is reasonable suspicion of the passenger's participation in criminal activity, then Terry does permit a frisk of the passenger." Further, this conflation of the two steps of Terry analysis was error; the district court should have stated that "the officers . . . needed reasonable, articulable suspicion that [Braxton] was armed and dangerous." United States v. Brown, 401 F.3d 588, 592 (4th Cir. 2005).

B.

But the district court's failure to articulate the proper measure of a Terry frisk does not necessarily entitle Braxton to relief. In considering the suppression ruling, "[w]e are not limited to evaluation of the grounds offered by the district court to support its decision, but may affirm on any grounds apparent from the record." United States v. Smith, 395 F.3d 516, 519 (4th Cir. 2005). Here, the district court explicitly found that the police had a reasonable "suspicion that the Defendant may have been involved in the theft of a car" -- a conclusion amply supported by the testimony about the license plates that did not belong to the vehicle, heavily tinted windows on the car, Braxton's nervousness about the arrival of the police (especially in contrast to the boisterousness of the other passengers), and the nature of the area in which the stop occurred.

6

None of these primary facts are in dispute, much less clearly erroneous. While in some cases the circumstances of an investigative stop would not supply the rationale for a Terry frisk, in others, the circumstances leading to the stop would bear directly upon the reasonableness of the subsequent Terry frisk. Such is the case here. It seems unnecessary, therefore, to remand to the district court to reiterate what the court's findings have already revealed -- that Officer Williams had a reasonable suspicion that Braxton was armed and dangerous. After all, as the District of Columbia Circuit has emphasized, "car theft is a crime that often involves the use of weapons and other instruments of assault that could jeopardize officer safety, and thus justifies a protective frisk under Terry." United States v. Bullock, 510 F.3d 342, 347 (D.C. Cir. 2007).

The cases to this effect are legion. See, e.g., United States v. Garcia-Rivera, 353 F.3d 788, 791 (9th Cir. 2003) (approving pat-down when "[i]nability to provide proof of registration gives rise to suspicion of a stolen vehicle"); United States v. Rowland, 341 F.3d 774, 784 (8th Cir. 2003) ("[L]aw enforcement could infer the vehicle might be stolen, and as possible car thieves [defendants] might possess weapons."); United States v. Shranklen, 315 F.3d 959, 963 (8th Cir. 2003) (holding that defendants "might have stolen the car and, therefore, might have weapons in the car that they used during

7

the theft or had available in case they were discovered"); United States v. Tuggle, 284 Fed.Appx. 218, 227 (5th Cir. 2008) ("[W]hen [defendant]'s conduct reasonably suggested that he might be part of that auto-theft ring, the officers were justified in fearing for their safety."); United States v. Williams, 7 Fed.Appx. 876, 885 (10th Cir. 2001) (Officer's "frisk of [defendant] for weapons . . . was permissible under Terry" in light of "the objectively reasonable suspicion that the van was stolen.") United States v. Bradley, 1990 WL 124205 at *2 (6th Cir. 1990) ("It was reasonable for the officer to believe that appellant, who was suspected of having recently been involved in a car theft, might have been armed and dangerous.")

It is not at all a bad thing for trial courts to dot the "i" and cross the "t", and the court should have done so here. But the factual finding that the officers had a reasonable "suspicion that the Defendant may have been involved in the theft of a car," together with the other circumstances surrounding the encounter, leave the record sufficiently clear that the proper Terry standard was satisfied. We may thus affirm the ultimate ruling of admissibility notwithstanding the fact that the criteria for the Terry stop and Terry frisk should have been independently articulated and applied.

Contrary to the dissent's assertion, we are not "making . . . findings on a cold appellate record." Post at 23. The district court made the critical finding that this particular defendant may have been involved in auto theft, and that a Terry frisk was therefore justified. In accord with a variety of other courts, we merely hold that a factual finding that the defendant is a potential car thief supports the legal conclusion that there is reasonable suspicion that he is armed and dangerous.[1]

---

[1] This court's decision in United States v. Powell, ___ F.3d ___, No. 08-4696 (4th Cir. Nov. 14, 2011), is not to the contrary. In Powell, we held that a defendant's criminal history and misrepresentations about his driver's license were insufficient to justify a Terry frisk. See id. (slip op. at 11, 14). This case presents substantially different facts. At the very outset, the stop in Powell was for a burned-out headlight, whereas here the car in which Braxton was a passenger had license plates that did not match the vehicle -- a much greater indication that a serious crime was afoot in addition to being a traffic violation. When executing the stop, the police in Powell confronted a "relatively safe" situation in which there were more officers present than passengers in the car, and there was no evidence that the area where the stop occurred was itself notably dangerous. See id. (slip op. at 10-11). Here, the officers were both outnumbered and conducted the stop in a more treacherous area. Finally, while the stop was underway, the defendant in Powell was "amicable [and] cooperative," id. (slip op. at 11), whereas the district court here made the express finding that Braxton could have been involved in the theft of the car that the police had stopped -- an immediate crime of a serious nature that six other circuits have held presents a sufficiently inherent risk of confronting an armed and dangerous suspect that a Terry frisk is justified.

9

C.

In affirming the district court, we recall as well that a frisk is justified by the "'legitimate and weighty' interest in officer safety," Arizona v. Johnson, 129 S. Ct. 781, 786 (2009) (quoting Pennsylvania v. Mimms, 434 U.S. 106, 110 (1977)) -- a different purpose than "investigating possibly criminal behavior," Terry, 392 U.S. at 22, that justifies a stop in the first place. That protective interest is not attenuated because Braxton was a passenger and not the driver of the vehicle. For as the Supreme Court has noted, "the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver." Maryland v. Wilson, 519 U.S. 408, 414 (1997).

Here, the officers confronted a dangerous situation presenting numerous indicia of criminal activity. They were outnumbered by the passengers in a vehicle bearing bad tags traveling through a dangerous area with darkly tinted windows. While "[w]e do not exclude the possibility that in some circumstances a patdown is not required[,]. . . we hesitate before criticizing [Officer Williams's] choice of the means to protect himself in emergent circumstances on the street from the relative calm and safety of chambers." United States v. Casado, 303 F.3d 440, 448-49 (2d Cir. 2002) (citing Graham v. Connor, 490 U.S. 386, 396 (1989)).

Proper adherence to the standards of Terry does not require us to gamble with the lives of police officers who exercise reasonable judgment in fulfilling their duty in the trying situation presented by a roadside car stop. The Supreme Court has long noted that "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers." Michigan v. Long, 463 U.S. 1032, 1047 (1983) (citing Mimms, 434 U.S. 106). Officer Williams executed a minimally intrusive frisk, justified at the time by a reasonable suspicion that he and his fellow officers were in a situation that could escalate and place both the officers and the occupants of the car at risk. Where the totality of circumstances supports a reasonable suspicion that Braxton was "armed and dangerous," the absence of those three talismanic words, while error, is not fatal to the district court's ruling in this case.

## III.

Second, Braxton asserts that his original attorney provided him with ineffective assistance of counsel by failing to conduct an adequate investigation during plea negotiations. Braxton does not assert that the trial that resulted in his present conviction was unfair, only that his counsel's failure to obtain a recording of police radio communications induced him to reject a favorable guilty plea and exercise his right to trial. We

11

note that the Supreme Court is currently considering the broader question Braxton's appeal implicates -- whether a defendant is ever prejudiced by going to trial rather than accepting a guilty plea, even if that decision results from deficient performance of counsel -- in two consolidated cases. See Lafler v. Cooper, 131 S. Ct. 856 (No. 10-209) (2011); Missouri v. Frye, 131 S. Ct. 856 (No. 10-444) (2011). We need not await the resolution of those cases, however, because Braxton's appeal may be rejected on much narrower grounds; specifically, we agree with the district court that Braxton's counsel's performance did not fall "below an objective standard of reasonableness." Strickland v. Washington, 466 U.S. 668, 688 (1984).

Braxton's claim derives from the failure of his counsel to obtain the "KGA tape," a recording of police radio communications during an incident. Braxton's counsel requested (but did not subpoena) a copy of the tape from the government, but was told that the tape no longer existed. This was consistent with the prior experience of Braxton's counsel, who knew that KGA recordings are typically only kept for a short period of time after an incident. Braxton's counsel did subpoena the "CAD report," a written summary of those radio communications.

The CAD report erroneously contained inconsistencies with the testimony of Officer Allen, reporting that he only requested

12

a check of the vehicle's license plates after initiating the Terry stop. Braxton's counsel discussed with him the options this presented for seeking suppression of the firearm recovered in that stop and for impeaching the testimony of the police officers involved. During this time, the government offered Braxton two separate plea agreements, one for a federal charge of possession of a stolen gun and one for a state firearms charge. During both negotiations, Braxton's counsel recommended that he accept the plea offers. Braxton ignored this advice and rejected the deals, proceeding to trial apparently in the belief that the inconsistencies in the CAD report might lead to his acquittal.

Later, however, the KGA tape was discovered, to the surprise of both the government and Braxton's counsel. The recording confirmed Officer Allen's account of the order in which events transpired, essentially eliminating the impeachment value of the CAD report.

Braxton simply cannot show that his counsel performed deficiently. First, and most plainly, Braxton acted against the advice of counsel in rejecting the guilty pleas. While it is an open question before the Supreme Court whether a defendant is prejudiced when he follows the erroneous advice of counsel to seek a trial, Braxton rejected counsel's wise advice to plead guilty -- counsel knew that, even before emergence of the

13

damaging KGA tape, Braxton's chances of success at trial were bleak. In essence, Braxton seeks to blame his counsel, who gave him good advice, for not giving that advice well enough. We will not permit the buyer's remorse of a defendant who insists on going to trial to impugn the sound advice of his attorney that he pursue the more prudent path of the plea bargain.

Second, Braxton's claim boils down to the assertion that it was ineffective for his counsel merely to have "requested" the KGA tape, rather than subpoenaing it. While it is doubtful that a subpoena would have actually brought forth the evidence sought, since the government was, at that time, also unaware that the tape was available, the distinction between a request and a subpoena is not one of constitutional moment here.

The Court in Strickland did not require that counsel employ every investigative technique imaginable, but rather held that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91. Braxton's counsel reasonably believed -- based on long experience as a Federal Public Defender -- that the tape would not be available. He took the precautionary step of requesting it anyway, and, when told the tape did not exist, counsel subpoenaed the CAD report as the next best evidence of what transpired. It was not

14

a deficiency of Braxton's counsel that the CAD report did not accurately record when in the course of the encounter the request for a license plate check was made, nor was it subpar performance for Braxton's counsel to believe the government's representation that the KGA tape did not exist. In short, Braxton's counsel's actions throughout fell "well within the range of professionally reasonable judgments." Id. at 700.

IV.

Third, Braxton asserts violations of both his statutory and constitutional rights to a speedy trial.

A.

The Speedy Trial Act, 18 U.S.C. § 3161, provides that a defendant shall be brought to trial "within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." Id. § 3161(c)(1). Braxton asserts that because it was almost three years from his arrest until his trial, he suffered an impermissible delay. But the statute also provides that "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion" is excludable

15

from the 70-day window.  Id. § 3161(h)(1)(D).  Braxton's case was brought well within this window.

Braxton's initial appearance on the first indictment took place on September 24, 2007.  His first set of motions was filed twenty-nine days later, on October 23, 2007.  Those motions remained pending until the dismissal of his first indictment on September 17, 2008.  He was then reindicted, and had his initial appearance on that charge on September 24, 2008.  His second set of motions was filed sixteen days later, on October 10, 2008.  Those motions were pending until their resolution on the first day of trial, March 16, 2009.  Giving the defendant the benefit of any doubt and combining both the twenty-nine day period on the first indictment and the sixteen day period on the second indictment, only 45 total non-excludable days of the permissible 70 elapsed -- well within the permissible bounds of the Speedy Trial Act.[2]

B.

Braxton also alludes to the constitutional requirement of a prompt trial under the Sixth Amendment.  We employ the four part

---

[2] Braxton contends, with no supporting authority, that this time should not be excluded because the motions were "simple." This court has been clear, however, that when a trial court defers resolution of a pretrial motion until the trial itself, all pending time may properly be excluded under the Act, and there is "no requirement that this time be justified as reasonable."  United States v. Riley, 991 F.2d 120, 124 (4th Cir. 1993).

16

test established by the Supreme Court in <u>Barker v. Wingo</u>, 407 U.S. 514 (1972), to evaluate this claim. The factors to be considered are (1) the length of the delay; (2) the reason for the delay; (3) whether the defendant timely asserted his right; and (4) whether delay prejudiced the defendant's case. <u>Id.</u> at 530.

First, the delay here amounted to almost exactly two years from the initial indictment until the beginning of trial. While that time period is long enough to merit further examination of the <u>Barker</u> factors, it is consistent with other cases in which this court has found no Sixth Amendment violation. <u>See, e.g.</u>, <u>United States v. Hall</u>, 551 F.3d 257 (4th Cir. 2009).

Second, the reason for the delay was eminently reasonable: a key law enforcement witness had been called up for deployment to Iraq. It is particularly jarring for Braxton to describe Officer Allen's absence -- occasioned by military service to this nation overseas -- as due to "negligence or lack of diligence" on the part of the government. In all events, this court has been clear that "a missing witness" qualifies as a "valid reason for delay" by the prosecution. <u>Id.</u> at 272.

Third, Braxton only first raised this claim on February 9, 2009, hardly a prompt insistence on strict observance of constitutional timeliness requirements.

17

Lastly, Braxton points to no way in which he was prejudiced. He shows no evidence that was lost. He makes no demonstration that his case was harmed other than the naked assertion that "[h]e had witnesses who were originally available that may have been helpful." None of this approaches <u>Barker</u> error, and we affirm the district court's rejection of Braxton's constitutional speedy trial claim.[3]

---

[3] Braxton raises three other claims that are equally meritless. First, he claims that his second indictment should have been reassigned to Judge Motz rather than newly distributed to Judge Quarles, speculating that he was prejudiced because Judge Motz "may have made a different ruling" on Braxton's motions. No legal authority entitles Braxton to a particular jurist, and his speculation as to rulings is as irrelevant as it is unsupported.

Second, Braxton asserts that his Fifth Amendment rights were violated by failure of the government to resubmit his case to the grand jury after Judge Motz dismissed the initial indictment. This contention is false. The September 17, 2008 second indictment was plainly returned by the grand jury, bearing the "True Bill" designation.

Finally, Braxton asserts that the district court erred in considering one of his Maryland narcotics convictions as a predicate under the Armed Career Criminal Act. The government, however, provided certified documents showing that the convictions were for qualifying felonies under Maryland state law. Further, Braxton has made no showing other than his own assertion that the Maryland conviction was in any way uncounselled, a point his primary brief does not raise and that in no way justifies overturning the reasoned sentencing conclusions of the district court.

18

V.

Finding each of Braxton's claims to be without merit, the judgment of the district court is

AFFIRMED.

WYNN, Circuit Judge, dissenting:

This case involves the patdown search of a passenger in, not the driver of, a vehicle. Recently, in <u>Arizona v. Johnson</u>, the Supreme Court held: "To justify a patdown of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." 555 U.S. 323, 327 (2009).

The majority opinion agrees that the record in this matter shows conclusively that the district court made no findings regarding whether Defendant, the passenger in this case, was armed and dangerous. <u>Ante</u> at p.6. Even further, the majority opinion agrees that the district court erred in holding that the officers were justified in patting down the passenger based <u>only</u> on the "suspicion that the Defendant may have been involved in the theft of a car." J.A. 30.

However, whereas the majority sees the district court's erroneous conclusion as a mere harmless failure to "dot the 'i' and cross the 't,'" I consider the error to be both a misstatement and, more importantly, a misapplication of binding Supreme Court precedent. For a patdown search to be justified, <u>Arizona v. Johnson</u> explicitly requires a finding that the officer had a reasonable suspicion that this particular passenger was armed and dangerous. 555 U.S. at 327. Not only

did the district court fail to make any such a finding, no evidence exists in this case that would be sufficient for this Court to assume the role of a trial court and make such finding in its stead.  I must therefore, with great respect for the differing view of my colleagues, dissent.

It is important to note that the district court here did correctly observe that "merely being a passenger in a car that was stopped does not necessarily give the Government the right to frisk one."  Volume I, Transcript of Motions Hearing, at 120, United States v. Braxton, Case No. 1:08-cr-00444-WDQ-1 (Mar. 16, 2009) [hereinafter referred to as "Transcript"].  Likewise, our own Court's case law provides that "[b]ecause a frisk or 'pat down' is substantially more intrusive than an order to exit a vehicle or to open its doors, . . . an officer must have justification for a frisk or a 'pat down' beyond the mere justification for the traffic stop."  United States v. Sakyi, 160 F.3d 164, 169 (4th Cir. 1998) (emphasis added).  Despite this clear precedent, under the majority's holding, any passenger in a vehicle with bad license tags could be subjected to a patdown search, even absent a finding of reasonable suspicion that particular individual is armed and dangerous, if the vehicle is stopped in a high-crime area.

To support this extension of the law, the majority states: "In accord with a variety of other courts, we merely hold that a

21

factual finding that the defendant is a potential car thief supports the legal conclusion that there is reasonable suspicion that he is armed and dangerous." Ante p. 9. But the "variety" of cases relied upon by the majority generally involved the search of the driver, not the passenger, see United States v. Bullock, 510 F.3d 342 (D.C. Cir. 2007), and United States v. Garcia-Rivera, 353 F.3d 788 (9th Cir. 2003), or otherwise entailed additional extenuating circumstances, see United States v. Rowland, 341 F.3d 774, 784 (8th Cir. 2003) (search of the vehicle's interior); United States v. Shranklen, 315 F.3d 959, 963 (8th Cir. 2003) (patdown of passenger was with consent); United States v. Tuggle, 284 F. App'x 218, 227 (5th Cir. 2008) (search was not in context of a Terry stop but in course of ongoing investigation); and United States v. Williams, 7 F. App'x 876, 885 (10th Cir. 2001) (stop became detention, and passenger's inability to answer questions suggested he might be involved in the theft of the vehicle).

In this case, the record shows that the officers stopped the vehicle because it had an incorrect license tag, had heavily tinted windows, and was being driven in a high-crime area. Those observations constituted the justification for the traffic stop. Thus, at the time the vehicle was stopped, Defendant was merely a passenger in a car stopped by police for traffic infractions. The police had no information that linked

22

Defendant to the alleged theft of the tags or that the vehicle itself was even stolen.

To be sure, the record includes Officer Williams's testimony regarding Defendant's "nervousness." But the district court made no findings with respect to that testimony, or concerning Officer Williams's statement that he conducted the patdown search of Defendant for "officer safety." In short, the district court made no findings regarding whether Officer Williams had a reasonable suspicion that Defendant was armed and dangerous. Indeed, beyond the findings about the traffic infractions that justified the stop of the vehicle, the district court made no reference whatsoever to Defendant or his conduct, and certainly not that he was a "potential car thief" or even specifically that the suspected criminal activity was "auto theft," rather than the theft of a license plate. Ante p. 9.

Under these circumstances, this Court should not seek to create a particularized "justification . . . beyond the mere justification for the traffic stop," Sakyi, 160 F.3d at 169, namely, Defendant's "nervousness about the arrival of the police," ante p. 6. Making such findings on a cold appellate record, particularly those that rest on the credibility determinations of witnesses, falls well outside the proper role of this Court:

> Factfinders exist for definite purposes, one of which is to observe the demeanor of [witnesses] . . . .

23

> Appellate courts are well-positioned to determine whether a factual finding is without support in the evidence; we are much less able simply to overturn a factfinder on a question on which two views of the evidence are possible. . . . Factfinders routinely resolve discrepancies between evidentiary sources, and by being able to observe testimony first-hand, they are in the best position to do so.

Harris v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor, 3 F.3d 103, 106-07 (4th Cir. 1993). See also Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985) ("In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo." (quotation marks and citation omitted)).

It is worthwhile to remember that we have long resisted engaging in such fact-finding, even when it might be expedient for reasons of judicial economy, and even when the evidence is undisputed:

> We are unwilling to . . . substitute fact finding at the appellate level for fact-finding at the trial level. The fact-finding responsibility has long been recognized as one for the trial court and sound practice suggests strict observance of this division of responsibility between trial and appellate courts except in the most exceptional circumstances.

Wimmer v. Cook, 774 F.2d 68, 76 (4th Cir. 1985). See also United States v. Stevenson, 396 F.3d 538, 543 (4th Cir. 2005) ("If appellate courts were to begin the practice of making competitive findings with respect to undisputed or documentary evidence, they would usurp the trial function . . . .").

24

Here, while there was "testimony about the license plates that did not belong to the vehicle, heavily tinted windows on the car, [Defendant's] nervousness about the arrival of the police, . . . and the nature of the area in which the stop occurred," ante p. 6 (emphasis added), there are no actual findings by the district court about these critical facts, particularly with respect to Defendant's failure to make eye contact, or whether Officer Williams's concerns for his safety were reasonable or particularized to Defendant.[1] Hindsight cannot be the judge of such behavior. See United States v. Martinez-Fuerte, 428 U.S. 543, 565 (1976) (noting that a purpose of the Fourth Amendment is to "prevent hindsight from coloring the evaluation of the reasonableness of a search or seizure").

On this record, it cannot be discerned why the district court failed to make the necessary findings. It is entirely possible that the district court heard Officer Williams's testimony, the Government's reasoning, and defense counsel's

---

[1] In fact, some of Officer Williams's testimony suggests that his safety concerns were generalized and not specific to Defendant or his behavior. When he first heard the radio call, before he had even seen Defendant or gotten to the location of the traffic stop, he recalled that "four occupants in a vehicle in that area, bad tags, and, based on working in that area for . . . six years prior to that incident, that usually means some criminal activity possibly involved." J.A. 17. After noting that Defendant seemed nervous during the stop, he testified that he told Defendant, "'Sir, I've got to pat you down for weapons for safety,' given the totality of the whole situation and my dealings with bad tags and individuals in that area." J.A. 19.

25

arguments, and found the stated justifications for a suspicion of Defendant's being armed and dangerous did not meet the standard of reasonable suspicion.  Perhaps the district court instead only found it reasonable for Officer Williams to have suspected Defendant was engaged in criminal activity.  Under clear Supreme Court precedent, that is not the required justification for a patdown search of a passenger in a vehicle subjected to a Terry stop.

Likewise, I can find no support in the record for the majority opinion's statement that, "Braxton then elbowed Officer Williams in an attempt to escape, but he was subdued after a struggle with Officer Williams and another assisting officer." Ante p. 3.  The transcript shows that Officer Williams recalled that Defendant "attempted to elbow me to get me off of him." Transcript, at 56.  Nothing in the record indicates that Officer Williams stated that Defendant made "an attempt to escape."

To the contrary, Officer Williams testified under cross-examination that the police report was incorrect if it reflected that Defendant "attempted to push [Officer Williams] back and run" and that in fact Defendant complied with Officer Williams's request to get out of the vehicle and put his hands up, allowing Officer Williams to pat him down.  Transcript, at 61.  He further agreed that "any insinuation in the police report" that Defendant did not comply was incorrect.  Id. at 62.

26

Moreover, because Defendant's "nervousness" is the sole factor particularized to him and not related to the justification for the Terry stop, that conduct is the linchpin of whether the search in question was reasonable. See, e.g., Illinois v. Wardlow, 528 U.S. 119, 124 (2000) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."). See also Terry v. Ohio, 392 U.S. 1, 21 n.18 (1968) ("This demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence."). As such, the appellate fact-finding engaged in by the majority on this point is especially inappropriate.

I note as well that we have previously recognized that mere nervousness is not necessarily suspicious behavior. See United States v. Massenburg, 654 F.3d 480, 489 (4th Cir. 2011) ("Given the complex reality of citizen-police relationships in many cities, a young man's keeping his eyes down during a police encounter seems just as likely to be a show of respect and an attempt to avoid confrontation."). The panel in Massenburg further quoted the following persuasive language from other courts:

> [I]t is common for most people to exhibit
> signs of nervousness when confronted by a law

> enforcement officer whether or not the person is currently engaged in criminal activity. Thus, absent signs of nervousness beyond the norm, we will discount the detaining officer's reliance on the detainee's nervousness as a basis for reasonable suspicion.
>
> [United States v. Salzano,] 158 F.3d 1107, 1113 (10th Cir. 1998) (internal quotation marks and citations omitted). See also State v. Lee, 265 Neb. 663, 658 N.W.2d 669, 678–79 (2003) ("[N]ervousness is of limited value" to reasonable suspicion analyses as "it is common knowledge that most citizens whether innocent or guilty, when confronted by a law enforcement officer who asks them potentially incriminating questions are likely to exhibit some signs of nervousness.").

Massenburg, 654 F.3d at 490. Even Officer Williams conceded that "different people react different ways when the police show up." Defendant's supposed nervousness, or failure to make eye contact, is hardly a definitive indicator of dangerousness.

Had the front-seat passenger in this case been the driver's grandmother, whom the driver had perhaps just picked up to go shopping, rather than Defendant, then her nervousness may well have been deemed typical, rather than suspicious, behavior. And yet, I can find no evidence in this record to suggest that this particular Defendant had any more knowledge that the car in which he was a passenger was stolen than the driver's grandmother might have.

Nothing indicates that the vehicle to which the license plate actually belonged was stolen just prior to the traffic stop, or that the vehicle appeared to be attempting to flee the

28

police, or that there was any information that more than one individual was responsible for the theft. Moreover, the radio call mentioned only that the tags did not match the vehicle, not that the vehicle itself was stolen. See United States v. Foster, 634 F.3d 243, 248 (4th Cir. 2011) ("[A]n officer and the Government must do more than simply label a behavior as 'suspicious' to make it so. The Government must also be able to either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance."); United States v. Powell, No. 08-4696, ___ F.3d ___, ___, 2011 U.S. App. LEXIS 22795 (4th Cir. Nov. 14, 2011) (holding that the district court should have suppressed evidence seized during a patdown search of a passenger during a traffic stop despite the passenger's prior criminal record for armed robbery and his "purported deliberate misrepresentation concerning the validity of his driver's license").[2] See also Terry, 392 U.S. at 21-22 (noting

---

[2] Unlike the district court in this case, the district court in Powell explicitly held that "the officers had reasonable suspicion that [Defendant] was armed and dangerous and were thus entitled to frisk him." ___ F.3d at ___, 2011 U.S. App. LEXIS 22795, *2. This Court's analysis in Powell thus rightly focused instead on the question of whether the evidence supported such a conclusion.

In so focusing, this Court also recognized the danger of "cobbling together a set of facts that falls far short of (Continued)

29

that police officers must have "specific and articulable facts" to justify a search, as "[a]nything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches").

In sum, the district court's error was not some harmless conflation of the two standards under Terry. Rather, the district court misstated and applied the wrong standard to determine the constitutionality of a search, a possible violation of one of the rights we hold most dear. The majority nonetheless makes its own findings to uphold the search in this matter on the basis that the reasonable suspicion that Defendant may have been involved in the theft of a car is sufficient to pass constitutional muster, when combined with an appellate court's finding of "nervousness," the sole factor particularized to Defendant. Such a conclusion, and the legal gymnastics it

---

establishing reasonable suspicion." Id. at ___, 2011 U.S. App. LEXIS 22795, at *3. Quoting Foster, Massenburg, and United States v. Digiovanni, 650 F.3d 498 (4th Cir. 2011), as examples of cases in which "the Government failed to meet its minimal burden of articulating facts sufficient to support a finding of reasonable suspicion," this Court vacated the judgment against Powell on the same grounds. Id. at ___, 2011 U.S. App. LEXIS 22795, *2-*3.

Thus, the most critical distinction from Powell is that in this case it is this Court, rather than the district court, that is "cobbling together a set of facts that falls far short of establishing reasonable suspicion." Id. at ___, 2011 U.S. App. LEXIS 22795, *3.

entails, is plainly contrary to the Supreme Court's holdings in Terry and Johnson, as well as our own Court's precedent concerning the propriety of appellate fact-finding. Accordingly, I must respectfully dissent.